DAN RAYFIELD
Attorney General
BRIAN SIMMONDS MARSHALL #196129
LEANNE HARTMANN #T25070201, Mass. BBO # 667852
Senior Assistant Attorneys General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email:  Brian.S.Marshall@doj.oregon.gov
        Leanne.Hartmann@doj.oregon.gov

*Attorneys for the State of Oregon*

[Additional counsel to appear on signature page]

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON**

| | |
|---|---|
| STATE OF NEW YORK; STATE OF COLORADO; STATE OF MINNESOTA; STATE OF OREGON; STATE OF CALIFORNIA; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAIʻI; STATE OF ILLINOIS; OFFICE OF THE GOVERNOR, *ex rel.* ANDY BESHEAR, in his official capacity as Governor of the Commonwealth of Kentucky; STATE OF MAINE; STATE OF MARYLAND; STATE OF MICHIGAN; STATE OF NEVADA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; JOSH SHAPIRO, in his official capacity as Governor of the Commonwealth of Pennsylvania; STATE OF WASHINGTON; STATE OF WISCONSIN, <br><br>                        *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF ENERGY; CHRIS WRIGHT, in his official capacity as Secretary of the U.S. Department of Energy, <br><br>                        *Defendants*. | Case No. 6:25-cv-01458 <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.     Plaintiff States bring this lawsuit to challenge a policy issued by Defendant the United States Department of Energy (DOE) that will unlawfully limit awards to Plaintiff States.

2.     DOE awards provide Plaintiff States with key services and programs. State energy agencies, which receive substantial funding from DOE, have wide-ranging missions to promote energy efficiency, increase our nation's energy security, support lower long-term consumer costs and reduced energy cost burdens for residents in our states, and support emergency preparedness efforts.

3.     But the challenged DOE Policy, announced in DOE Policy Flash 2025-25 (the "Policy Flash"), arbitrarily limits those awards by limiting the sum of indirect costs and fringe benefits costs included in awards to 10% of the total award amount. Indirect costs are costs that are shared among multiple projects, including, for example, the costs of operating a facility that supports more than one funded project or the cost of staff that work on multiple projects. Fringe benefits are costs for staff that accompany their salaries, such as health insurance and pensions.

4.     The Policy Flash unlawfully contravenes the regulatory scheme provided by DOE and the Office of Management and Budget that allocates indirect costs based on a single rate that a state agency negotiates with a particular federal agency, which all other federal agencies are required to accept.

5.     The Policy Flash contains conclusory and arbitrary reasoning, such as the truism that "indirect cost payments are not for funding the Department's direct project activities." But nowhere does the Policy Flash acknowledge that indirect costs are merely costs shared among projects, many of which are critical to the central purpose of the funding. This is precisely the

reason for the longstanding prior practice. Nor does the Policy Flash grapple with the real-world consequences of this policy or consider States' reliance interests.

6.      Four times this year, federal agencies (including DOE itself) have issued policies setting a cap on grantees' ability to recover indirect costs under federal awards. All four times, federal courts swiftly intervened, enjoining or vacating these policies as unlawful on these same grounds.

7.      Unlike the four enjoined policies, the Policy Flash purports to impose a cost cap (rather than a rate cap) and sweeps in fringe benefits costs. But these differences do nothing to ameliorate the legal infirmities other courts have identified. To the contrary, the cap—however framed—is unlawful for the same and even more reasons, including because it is contrary to regulations mandating that an award be comprised of *all* allowable direct costs and allocable indirect costs. And the unprecedented decision to cap fringe benefits further contravenes regulations mandating reimbursement of fringe benefits.

8.      Because indirect and fringe costs awarded by the DOE to Plaintiff States fund crucial work like supporting energy security, lowering energy costs, reducing greenhouse gas pollution, and enabling the transition to clean energy sources, Plaintiffs bring this action to protect their states and institutions from DOE's unlawful policy.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction under 28 U.S.C. §§ 1331 and 2201(a).  Jurisdiction is also proper under the judicial review provisions of the APA.  5 U.S.C. §§ 702, 704.

10.     An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201–2202, and 5 U.S.C. §§ 705–706.

11.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are an agency of the United States Government and an officer sued in his official capacity. The capitol of Oregon and the principal offices of the Oregon Department of Energy are in Marion County, and a substantial part of the events giving rise to this Complaint occurred and continue to occur within Marion County and the District of Oregon.

## PARTIES

### *Plaintiffs*

12.     Plaintiff the State of New York, represented by and through its Attorney General Letitia James, is a sovereign state of the United States. The Attorney General is New York State's chief law enforcement officer and is authorized under N.Y. Executive Law § 63 to pursue this action.

13.     Plaintiff the State of Colorado, represented by and through its Attorney General Phil Weiser, is a sovereign state of the United States. The Attorney General acts as the chief law enforcement officer of the State.

14.     Plaintiff the State of Minnesota is a sovereign state of the United States of America. Minnesota is represented by Attorney General Keith Ellison, who is the chief law enforcement officer of Minnesota.

15.     Plaintiff the State of Oregon is a sovereign state of the United States. Oregon is represented by Attorney General Dan Rayfield. The Attorney General is the chief legal officer of Oregon and is authorized to institute this action.

16.     Plaintiff the State of California is a sovereign state of the United States of America. California is represented by Attorney General Rob Bonta, who is the chief law enforcement officer

of California. The California Energy Commission is the primary energy agency and administers several DOE-funded awards for California, including State Energy Program (SEP) awards.

17.     Plaintiff the State of Connecticut is a sovereign state in the United States of America. Connecticut is represented by Attorney General William Tong, who is the chief law enforcement officer of Connecticut.

18.     Plaintiff the State of Delaware is a sovereign state of the United States of America. This action is brought on behalf of the State of Delaware by Attorney General Kathleen Jennings, the "chief law officer of the State." *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403 (Del. 1941). Attorney General Jennings also brings this action on behalf of the State of Delaware pursuant to her statutory authority. Del. Code Ann. tit. 29, § 2504.

19.     Plaintiff the District of Columbia is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, Attorney General Brian L. Schwalb. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest. D.C. Code. § 1-301.81.

20.     Plaintiff the State of Hawai'i, represented by and through its Attorney General Anne Lopez, is a sovereign state of the United States. The Attorney General is Hawaii's chief legal officer and chief law enforcement officer and is authorized by Hawaii Revised Statutes § 28-1 to pursue this action.

21.     Plaintiff the State of Illinois is a sovereign state in the United States of America. Illinois is represented by Kwame Raoul, the Attorney General of Illinois, who is the chief law

enforcement officer of Illinois and authorized to sue on the State's behalf. Under Illinois law, the Attorney General is authorized to represent the State's interests by the Illinois Constitution, article V, § 15. *See* ILC 205-4.

22.     Plaintiff Office of the Governor, *ex rel.* Andy Beshear, brings this suit in his official capacity as Governor of the Commonwealth of Kentucky. The Kentucky Constitution makes the Governor the Chief Magistrate with the "supreme executive power of the Commonwealth," Ky. Const. § 69, and gives the Governor, and only the Governor, the duty to "take care that the laws be faithfully executed," *id.* § 81; *Beshear v. Bevin*, 498 S.W.3d 355, 369 (Ky. 2016) (citing Ky. Const. § 81). Under Kentucky statute, the Governor is the head of his General Cabinet and his Executive Cabinet. Ky. Rev. Stat. §§ 11.060, 11.065. The Governor's Executive Cabinet consists of the Secretaries of executive branch cabinets, including the Kentucky Energy and Environment Cabinet. In fulfilling his constitutional duties, the Governor has authority to bring this action.

23.     Plaintiff the State of Maine is a sovereign state in the United States of America. Maine is represented by Attorney General Aaron Frey, who is the chief law enforcement officer of Maine.

24.     Plaintiff the State of Maryland is a sovereign state of the United States of America. Maryland is represented by Attorney General Anthony G. Brown, who is the chief legal officer of Maryland.

25.     Plaintiff the State of Michigan is a sovereign state of the United States of America.  Michigan is represented by Attorney General Dana Nessel, who is the chief law enforcement officer of Michigan.

26.     Plaintiff the State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign State within the United States of America. The Attorney General is the

chief law enforcement of the State of Nevada and is authorized to pursue this action under Nev. Rev. Stat. 228.110 and Nev. Rev. Stat. 228.170.

27.     Plaintiff the State of New Mexico is a sovereign state of the United States of America. New Mexico is represented by Attorney General Raúl Torrez who is the chief law enforcement officer of New Mexico.

28.     Plaintiff the State of North Carolina is a sovereign state of the United States of America. North Carolina is represented by Attorney General Jeff Jackson, who is the chief law enforcement officer of North Carolina.

29.     Plaintiff Josh Shapiro brings this suit in his official capacity as Governor of the Commonwealth of Pennsylvania. The Pennsylvania Constitution vests "[t]he supreme executive power" in the Governor, "who shall take care that the laws be faithfully executed." Pa. Const. art. IV, § 2. The Governor oversees all executive agencies in Pennsylvania and is authorized to bring suit on their behalf. 71 P.S. §§ 732-204(c), 732-301(6), 732-303.

30.     Plaintiff the State of Washington is a sovereign state of the United States of America. Washington is represented by Attorney General Nicholas W. Brown. The Attorney General of Washington is the chief legal adviser to the State and is authorized to act in federal court on behalf of the State on matters of public concern. Chapter 43.10 RCW.

31.     Plaintiff the State of Wisconsin is a sovereign state in the United States of America. Wisconsin is represented by Josh Kaul, the Attorney General of Wisconsin. Attorney General Kaul is authorized to sue on behalf of the State.

***Defendants***

32.     Defendant United States Department of Energy (DOE) is an executive agency of the federal government that is responsible for ensuring America's security and prosperity by

addressing its energy, environmental and nuclear challenges through science and technology solutions.

33.        Defendant Chris Wright is the Secretary for the U.S. Department of Energy.  He is sued in his official capacity.

## ALLEGATIONS

I.        **Statutory and Regulatory Background**

34.        Congress has directed DOE to provide financial assistance to states including, for example, to support states in developing state energy conservation plans and to support weatherization of homes to increase energy efficiency and reduce energy costs. *See* 42 U.S.C. §§ 6323(b), 6864(a).

35.        These funds enable Plaintiff States to operate critical programs, including forecasting energy requirements; supporting renewable energy goals; tracking energy supply chains and resiliency; supporting emergency preparedness and responses to natural disasters; supporting energy affordability efforts; and preparing risk assessments related to the use of nuclear power or a radiological emergency.

36.        Congress has directed the Office of Management and Budget (OMB) to "establish general management policies for executive agencies," including policies for grant management. 31 U.S.C. § 503(b)(2)(C).

37.        OMB has accordingly established uniform administrative requirements, cost principles, and audit requirements for federal awards, codified in 2 C.F.R. part 200.

38.        Appendix VII of 2 C.F.R. part 200 provides the "methods for allocating indirect costs and computing indirect cost rates" for states, local governments, and Indian tribes. *Id.* at (C)(1)(c).

39.    DOE has adopted the 2 C.F.R. part 200 OMB policies. 2 C.F.R. § 910.120; *see also* 10 C.F.R. §§ 600.2(b), 600.127(a), 600.222(b).

40.    DOE funding to States includes two types of costs.  The first is direct costs, *i.e.* costs that can be attributed to a specific project supported by DOE funding. 2 C.F.R. § 200.413(a). "Costs charged directly to a Federal award are typically incurred specifically for that Federal award (including, for example, supplies needed to achieve the award's objectives and the proportion of employee compensation and fringe benefits expended in relation to that specific award)." 2 C.F.R. § 200.413(b).  The second is indirect costs—*i.e.*, costs that "have been incurred for common or joint purposes" and therefore cannot be attributed and allocated directly to a specific project. 2 C.F.R. part 200 Appendix VII ¶ A(1); *see also* 2 C.F.R. § 200.414.

41.    Indirect costs include two broad categories: facilities and administration.  2 C.F.R. § 200.414(a). "Facilities" costs are "defined as depreciation on buildings, equipment and capital improvements, interest on debt associated with certain buildings, equipment and capital improvements, and operations and maintenance expenses." *Id.* "Administration" costs are "defined as general administration and general expenses such as the director's office, accounting, personnel, and all other types of expenditures not listed specifically under" the definition of "Facilities."  *Id.*

42.    Fringe benefits include additional staffing costs apart from salaries, such as the costs of employee leave, insurance, and pensions.

43.    Certain fringe benefits can be "charged as direct or indirect costs following the recipient's . . . accounting practices." 2 C.F.R. § 200.431(c); *see also id.* § 200.413(b). States often include "applicable fringe benefits" as part of their direct costs. 2 C.F.R. § 200.1.

44.    The total amount of a DOE award is the sum of the allowable direct costs and allocable indirect costs, less any credits.  2 C.F.R. § 200.402.

45.    A cost is "allowable" so long as it meets the basic criteria set forth in 2 C.F.R § 200.403, including, for example, that the costs must "[b]e adequately documented" and must "[b]e necessary and reasonable for the performance of the Federal award." *Id.* §§ 200.403(a), (g).

46.    Fringe benefit costs "are allowable provided that the benefits are reasonable and are required by law, an organization-employee agreement, or an established policy of the recipient or subrecipient." 2 C.F.R. § 200.431(a); *see also* 2 C.F.R. §§ 200.431(b)-(i).

47.    "A cost is reasonable" so long as it is "an amount that a prudent person would incur under the circumstances prevailing when the decision was made to incur the cost," taking into account various factors including market prices, the recipient's written policies and procedures, and State laws and regulations. 2 C.F.R. § 200.404.

48.    A cost is "allocable" so long as it meets the basic criteria set forth in 2 C.F.R. § 200.405, including that the cost "[i]s incurred specifically for the Federal award," "[b]enefits both the Federal award and other work of the recipient or subrecipient and can be distributed in proportions that may be approximated using reasonable methods"; or "[i]s necessary to the overall operation of the recipient or subrecipient and is assignable in part to the Federal award."

49.    As to indirect costs, "*All* activities which benefit from the recipient's or subrecipient's indirect cost . . . will receive an appropriate allocation of indirect costs." 2 C.F.R. § 200.405(b) (emphasis added).

## II.    Negotiated Indirect Cost Rates

50.    Each State agency negotiates an indirect cost rate with one "cognizant agency" of the federal government. 2 C.F.R part 200 Appendix VII ¶ D(1)(b); *see also* 2 C.F.R. § 200.416(b), (c).

51.    In general, the cognizant federal agency "is the Federal agency with the largest dollar value of total Federal awards with a [State] governmental unit." 2 C.F.R. part 200 Appendix V ¶ F(1).

52.    DOE is the cognizant federal agency for some State agencies that receive DOE grants, including some Plaintiff States' agencies responsible for energy policy and/or regulation ("State Energy Agencies"). Other federal agencies, such as the Department of Health and Human Services, serve as the cognizant federal agency for other DOE grantees.

53.    To start the negotiation, the State agency submits a proposal with supporting documentation for indirect costs to the cognizant federal agency. *See* 2 C.F.R. part 200 Appendix VII ¶¶ D(1)-(2).

54.    At the conclusion of the negotiation, the State agency's indirect cost rate is formalized in a written agreement between the cognizant federal agency and the State agency, called a Negotiated Indirect Cost Rate Agreement (NICRA).

55.    A NICRA may include: (a) a provisional rate, which is a temporary indirect cost rate applicable to a specified period which is used for funding, interim reimbursement, and reporting indirect costs on Federal awards pending the establishment of a final rate for that period; (b) a predetermined rate, which is an estimate of costs to be incurred in a future period to be used in situations where the cost experience and other available facts are sufficient to reach an informed judgment as to the probable level of indirect costs; and/or (c) a final rate which is an indirect cost rate applicable to a specified past period which is based on the actual allowable costs of the period. *See* 2 C.F.R. part 200 Appendix VII ¶ B.

56.    All types of indirect cost rates (provisional, predetermined, and final) provided in NICRAs are based on the State agency's submission of documentation and the negotiation between the cognizant federal agency and the State agency.

57.    Negotiated indirect cost rates in NICRAs are stated as a percentage rate that expresses indirect costs as a percentage of the "base" direct costs.

58.    The "base" direct costs can differ for different awards. Some NICRAs include only one rate that applies to all types of direct costs. 2 C.F.R. part 200 Appendix VII ¶¶ C(2)-(3). Other NICRAs include multiple rates, with different rates applicable to different types of direct costs that form the "base" direct costs for that rate. *See* 2 C.F.R. part 200 Appendix VII ¶¶ C(2)-(3). The base may be (1) "total direct costs," which include fringe benefits; (2) "direct salaries and wages"; or (3) "another base which results in an equitable distribution." 2 C.F.R. part 200 Appendix VII ¶ C(2)(c); 2 C.F.R. § 200.1.

59.    The indirect cost rate included in the NICRA is then binding on the entire federal government, often for two years or more. 2 C.F.R. § 200.414(c)(1); 2 C.F.R. part 200, Appendix VII ¶ E.

60.    A State agency without a NICRA may "elect to charge a de minimis rate" for indirect costs "of up to 15 percent." 2 C.F.R. § 200.414(f). Federal agencies "must not compel" an agency to "accept the de minimis rate." 2 C.F.R. part 200, Appendix VII ¶ D(1)(c).

61.    A Federal agency may deviate from the negotiated rate only in two circumstances: (1) "when required by Federal statute or regulation," or (2) "when approved by the awarding Federal agency in accordance with [2 C.F.R. § 200.414(c)(3)]." 2 C.F.R. § 200.414(c)(1).

62.    As to the second exception, 2 C.F.R. § 200.414(c)(3) states that: "The Federal agency must implement, and make publicly available, the policies, procedures and general

decision-making criteria that their programs will follow to seek and justify deviations from negotiated rates."

63.     A Federal agency must include the policies relating to indirect cost rates in the notice of funding opportunity.  2 C.F.R. § 200.414(c)(4).

### III.     DOE's Historical Practice in Awarding Indirect Costs and Fringe Benefits

64.     Until the Policy Flash, DOE, like other federal agencies, negotiated indirect cost rates as the cognizant federal agency with State agencies, including State energy agencies, and accepted State agencies' negotiated indirect cost rates with other cognizant federal agencies.

65.     Negotiated indirect cost rates are stated as a percentage of the relevant direct costs (in some cases, the base includes all direct costs, including fringe benefits, but in other cases the base includes a subset of direct costs). As a simple example, an award with $80,000 in direct costs and a 50% indirect cost rate on all direct costs would result in $40,000 of indirect costs (50% of the $80,000) and thus a total award of $120,000.

66.     For example, DOE negotiated with the New York State Energy Research and Development Authority (NYSERDA) and in December 2023 entered into a NICRA providing for final 2022-2023 negotiated indirect cost rates ranging from 40% to 52% and provisional 2023-2025 negotiated indirect cost rates ranging from 42% to 69%, depending on the expense type.

67.     The Colorado Energy Office (CEO) entered into a NICRA providing for a negotiated provisional indirect cost rate of 43.6% for state fiscal years 2026-2028.

68.     In March 2024, the predetermined indirect cost rates for the Maryland Energy Administration were approved at a rate of 40% by DOE.

69.     Historically, DOE, like other federal agencies, has complied with the regulatory scheme set forth in 2 C.F.R. part 200, awarding indirect costs at State agencies' negotiated indirect cost rate and awarding fringe costs in accordance with State agencies' accounting principles.

70.     Historically, DOE, like other federal agencies, has not imposed a cap on indirect costs and has awarded indirect costs pursuant to State agencies' negotiated indirect cost rates.

71.     Historically, DOE, like other federal agencies, has not imposed a cap on fringe costs.

**IV.    DOE's Policy Flash**

72.     On May 8, 2025, DOE issued the Policy Flash, formally titled "2025-25 Adjusting Department of Energy Financial Assistance Policy for State and Local Governments' Financial Assistance Awards." Exhibit 1. The Policy Flash "establish[ed] a new policy" imposing an across-the-board cap on the amount of indirect cost and fringe benefit expenditures. *Id.* at 3.

73.     Specifically, the Policy Flash "establish[ed] a maximum allowable dollar amount (stated in terms of a percentage of the total project award amount) that it will reimburse for allowable, allocable, and reasonable indirect costs." *Id.* "For state and local government financial assistance awards, this maximum percentage is 10 percent (10%)." *Id.* at 4. That percentage is "inclusive of total indirect costs and fringe benefit costs." *Id.* at 3.

74.     The Policy Flash directs that "recipients should continue to utilize their negotiated and approved indirect cost rate(s) in applications for Awards, but the Department will establish a maximum dollar amount that it will reimburse under Awards to state and local governments. The maximum limit of funds to be paid or reimbursed to a new Award recipient as indirect costs will be calculated as a percentage of the total project award amount and will be included in the Award terms as a cap." *Id.* at 4.

75.     The Policy Flash states that DOE "will limit the payment or reimbursement of all allowable, allocable, and reasonable indirect costs to a maximum of ten percent (10%) of the total project award amount." *Id.*

76.     The Policy Flash applies to "New Awards," that is, "Awards issued under Notices of Funding Opportunity yet to be released." *Id.* at 3.

77.     The Policy Flash also applies to "Conditional Awards," that is, "awards for prior Notices of Funding Opportunity or Funding Opportunity Announcements where negotiations are not yet complete and/or the Award has not been executed." *Id.*

78.     The Policy Flash provides the following reasoning:

While the Department is aware that many Award recipients use indirect cost payments to effectuate activities funded by the Department's financial assistance awards, these indirect cost payments are not for funding the Department's direct project activities. As these funds are entrusted to the Department by the American people, the Department must ensure it is putting funds to appropriate use on financial assistance programs. To improve efficiency and curtail costs where appropriate, the Department seeks to better balance the financial needs of financial assistance award recipients with the Department's obligation to responsibly manage federal funds. . . . When awarding financial assistance to state and local governments these policies, procedures, and criteria are intended to better balance the Department's dual responsibilities to financial assistance award recipients and the American people. . . . This policy will better balance the Department's twin aims of funding meaningful financial assistance programs to stimulate a public purpose, such as improved infrastructure or technology deployment, and upholding its fiduciary Federal Stewardship obligations to the American people.

*Id.* at 2-4.

79.     On June 30, 2025, DOE issued a financial assistance letter titled "FAL 2025-05, Implementation of Indirect and Fringe Benefits Cost Reimbursement Limits on Financial Assistance Awards." ("FAL"), Exhibit 2. Among other things, the FAL provides guidance for DOE grant officers on the implementation of the Policy Flash.

80.    The FAL explains that "[t]he maximum amount of funds that may be paid or reimbursed to a recipient for indirect and fringe benefits costs will be calculated as a percentage of the project's Total Award Amount"; that the rate for "State and Local Governments [is] up to 10% of the Total Award Amount"; and that this "percentage[]. . . may deviate from the recipient's negotiated indirect cost rates specified in the award." *Id.* at 4-5.

81.    The FAL provides sample language for Notices of Funding Opportunities, which states that "[a]pplicants and recipients must ensure that the sum of indirect costs and fringe benefits in the proposed budget do not exceed the maximum percentage allowed against the total award"; that "[t]his limit applies regardless of an applicant's negotiated indirect cost rate agreement (NICRA), rate proposal"; and that "[i]f an applicant's NICRA . . . rate yields higher indirect cost amounts than" the cap would allow, then the "limited amount must be used." *Id.* at 6.

82.    The FAL also provides sample language for Award Terms and Conditions applicable to States and local governments, which states: "In accordance with DOE Policy, while the recipient may allocate the listed indirect cost rates above, the recipient is limited to a **maximum percentage of 10% of the Total Award Amount for reimbursement of indirect costs and fringe benefits costs**. Therefore, the limitation for indirect cost and fringe benefits reimbursement on this award is **$[###,###]** or no more than **10%** of the total award." *Id.* at 8 (emphasis in original).

83.    The FAL also makes clear that the reimbursement limit applies to subrecipients, and that "[t]he maximum amount of funds to be paid or reimbursed from the recipient to a subrecipient for its indirect costs and fringe benefits under a subaward will be calculated as a percentage (%) of the total subaward amount, inclusive of the Federal and applicable non-Federal cost share amount." *Id.* at 6.

84.     On or about June 30, 2025, DOE began sending a letter ("June 30 Letter", Exhibit 3) to some Plaintiff States describing the Policy Flash and enclosing a fact sheet titled "Indirect Percentage (%) Cap Against Total Award Fact Sheet" ("Fact Sheet", Exhibit 4) that contains responses to "Frequently Asked Questions" regarding the Policy Flash.

85.     The Fact Sheet claims that "a percentage cap on indirect cost recovery is not an indirect rate cap." Ex. 4 at 1. It states that "[a] cap on an indirect rate means the organization cannot bill more than a specified indirect billing rate against the allocable cost base.  A cap on the indirect cost percentage (%) of the total award means the Recipient shall utilize an approved rate, but the resulting reimbursable costs for fringe and indirect costs cannot exceed the percentage cap"— that is, 10% "of the total award value." *Id.* at 2.

86.     The Fact Sheet states that State agencies "can use approved rates and allocation methodology from their Cognizant Agency; however, if the dollar amount of indirect costs under the approved rates exceeds the cap amount, the amount more than the cap is not allowed, and rates may need to be adjusted downward." *Id.* at 3.

87.     The Fact Sheet was accompanied by Narrative Calculation Guidance with an eight-step calculation procedure and an example calculation spreadsheet. Ex. 5.

88.     The Narrative Calculation Guidance acknowledges that "[s]ince the final award amount depends on the proposed budget (which includes both direct and indirect costs), you'll need to use an iterative process to ensure the indirect costs stay within the funder's cap (e.g., 'indirect costs cannot exceed X% of the total award')." *Id.* at 1.

89.     The Policy Flash is contrary to the regulatory framework described above in three key respects.

90.     First, the Policy Flash contravenes the basic requirement in 2 C.F.R. § 200.402 that a federal award be comprised of all allowable direct costs and allocatable indirect costs. *See also id.* §§ 200.403, 200.405. Contrary to this command, the Policy Flash excludes allowable fringe costs and allocatable indirect costs by directing States to limit fringe and indirect costs to under a total of 10% of the total award amount.

91.     Second, DOE must "accept[]" State agencies' negotiated indirect cost rates. 2 C.F.R. § 200.414(c)(1). Under the Policy Flash, however, DOE will reject those rates and impose its own cap.

92.     Moreover, the Policy Flash does not—and does not even purport to—meet the strict requirements for deviation from negotiated rates provided by 2 C.F.R. § 200.414(c).

93.     The Policy Flash is not "required by Federal statute or regulation." 2 C.F.R. § 200.414(c)(1). Nor does it meet *any* of the requirements for a deviation under § 200.414(c). It does not apply only to "a class of Federal awards or a single Federal award," *see* 2 C.F.R. § 200.414(c)(1); rather, it applies to all DOE awards to States and local governments, in perpetuity. The Policy Flash does not make "publicly available, the policies, procedures and general decision-making criteria that their programs will follow to seek and justify deviations from negotiated rates," 2 C.F.R. § 200.414(c)(3), as there are no such policies, procedures, or general decision-making criteria since DOE set a blanket rate applicable to all State and local applicants, forever.

94.     And as to what DOE terms "conditional" awards (that is, "awards for prior Notices of Funding Opportunity or Funding Opportunity Announcements where negotiations are not yet complete and/or the Award has not been executed," Ex. 1 at 3), the Policy Flash also fails to satisfy 2 C.F.R. § 200.414(c)(4), which requires indirect cost rates to be made available in the Notice of

Funding Opportunity, because those Notices were issued before the Policy Flash and did not make the terms of the Policy Flash cap available to the applicants.

95.     Additionally, the Policy Flash is in conflict with 2 C.F.R. § 200.414(f), which sets a 15% de minimis indirect cost rate where no NICRA is in place, as the effect of the Policy Flash in many cases is to set indirect costs below 15%. It is also in conflict with regulations providing for cost sharing under particular circumstances not present here. *See, e.g.*, 2 C.F.R. § 200.306(b-c).

96.     Third, the Policy Flash is unlawful because it limits allowable fringe costs. Limiting fringe costs violates 2 C.F.R. § 200.431, which provides that fringe costs are "allowable" so long as they are provided under established written leave policies and, where applicable, meet other regulatory requirements.

97.     The Policy Flash is also arbitrary and capricious.

98.     The Policy Flash offers conclusory and unsupported reasoning. It asserts that it will "improve efficiency," Ex. 1 at 3, but does not explain what efficiency means in this context, how or why it will be improved by the Policy Flash, or what data, if any, the agency reviewed to arrive at its conclusion. The Policy Flash states that it is intended to balance "the financial needs of financial assistance award recipients with the Department's obligation to responsibly manage federal funds," *id.*, but it does not explain what those needs and obligations are and how they were taken into account or balanced.

99.     The Policy Flash offers no explanation for why it set the cap at 10%, rather than, say, 30%, 15%, or 5%. Nor does the Policy Flash explain why this cap applies to fringe or to indirect costs, let alone why it applies to both. Nor does it explain why it applies to funding without Notices of Funding Opportunity, when only those awards are specifically described.

100.    The Policy Flash does not explain its substantial change from current practice, which awards indirect costs at the negotiated rate and fringe according to settled accounting principles. Nor did it consider the serious administrative complexities that would arise from the Policy Flash. In the Narrative Calculation Guidance, for example, DOE explains that the cap will require a new, complex, eight-step "iterative process." Ex. 5 at 1.

101.    The Policy Flash fails to account for the reliance interests of Plaintiff States and their agencies. Plaintiff States have structured their budgets with the understanding that federal agencies will pay their legally required indirect and fringe cost reimbursements. Plaintiff States' cost structures are fundamentally incompatible with the Policy Flash as Plaintiff States' indirect costs and fringe costs each typically exceed 10% of the total award amount. Plaintiff States have accordingly made costly decisions about long-term investments in reliance on their negotiated rates.

102.    For example, the Colorado Energy Office (CEO) has statutory requirements on how it must use much of its funding; CEO has hired staff to ensure the agency maintains compliance with its federal grants, and these costs cannot be paid with state funds. In addition, because the Colorado payroll system requires both an employee's salary and fringe benefits to come from the same account or set of funds, CEO cannot simply rearrange funds to pay staff fringe benefits from a different account.

103.    As another example, the policy shift to cap indirect cost reimbursement and include fringe benefits in those capped costs will result in unrecoverable expenses of approximately $230,000 annually for Kentucky. This will impair the Commonwealth's ability to support essential employees' direct costs and may result in increasing costs should the state move to alternative employment arrangements.

## V.     Harm to States

104.     The Policy Flash will cause immediate irreparable harm to Plaintiff States unless enjoined.

105.     Plaintiff States will be harmed by the Policy Flash because their State agencies cannot sustain DOE-sponsored grants if the maximum reimbursable dollar amount for indirect and fringe costs is capped at 10% of the total award amount.  Plaintiff States rely on these grants to implement clean energy generation and energy efficiency projects; fund weatherization assistance grants to help reduce energy bills for income-qualified residents; provide technical assistance and modeling support for state energy planning processes; and support emergency preparedness efforts, including nuclear emergencies. Plaintiff States' agencies will not be able to maintain these programs and activities at current levels and may be forced to abandon numerous projects and lay off staff.

106.     Plaintiffs States will also be harmed by the application of the 10% cap to their subrecipients. Capping reimbursement of indirect and fringe costs at 10% of the total subaward may be untenable for many subrecipients, and as a result, Plaintiff States may lose the ability to engage subrecipients to meet award objectives.

107.     This harm is immediate and ongoing, as DOE has already begun implementing the Policy Flash as to Plaintiff States.

108.     DOE operates the State Energy Program (SEP), which is intended to maximize the benefits of energy efficiency and renewable energy in each state and to help states improve the security of their energy infrastructure by assisting them with the development of state energy plans. SEP provides financial and technical assistance to states through formula and competitive grants.

States use their formula grants to develop state strategies and goals to address their energy priorities.

109.    Plaintiff States regularly receive SEP formula grants to support programs that help lower energy costs, secure the grid, and provide local economic stability.

110.    For example, in New York, NYSERDA uses SEP formula grants to track and plan for its long-term energy requirements and supply chain resiliency. In Colorado, CEO uses SEP formula grants to understand investment opportunities for advanced energy technologies. And the Minnesota Department of Commerce uses SEP formula grants to interface with and provide technical assistance to innovators, investors, policy makers, regulators, developers, producers and consumers to meet energy resource needs and drive economic development.

111.    SEP formula grants are awarded to states on a rolling basis, with an application deadline for a different set of States at three different times of year.

112.    In or around April 2025, a number of Plaintiff States, including New York, Colorado, Minnesota, and Oregon submitted their applications for the SEP formula grants.  States submit their applications for SEP formula grants on cycles. Not all states needed to submit their new applications in April, but all states will eventually need to do so.

113.    On or about July 1, 2025, DOE began to send letters to some Plaintiff States stating that the Policy Flash applies and directing Plaintiff States to submit a revised budget conforming to the 10% cap set out in the Policy Flash.

114.    On or about July 1, 2025, DOE started rejecting the applications of some Plaintiff States, stating that the Policy Flash applies and directing Plaintiff States to submit a revised budget conforming to the 10% cap set out in the Policy Flash.

115.    The emails enclosing the rejections stated:

In light of Policy Flash 2025-25, [DOE] needs you to bring your budget into compliance with our new financial assistance policy for State and Local governments. The indirect and fringe costs combined must total less than 10% of the total project proposed. Any application where the total indirect cost plus fringe cost proposed is greater than 10% of the total application's project will be rejected. . . . In many occasions, this policy flash will result in significantly altered budget proposals . . . .

116. The rejection emails contained a copy of the June 30 Letter, the Fact Sheet, and the attachments to the fact sheet described above. *Supra* ¶¶ 83-87.

117. On August 4, 2025, DOE sent an email to State Energy Agencies setting forth deadlines for the States applying in April to submit revised funding applications that conform to the Policy Flash of August 7, and August 15, 2025 for states applying in the next cycle. Those emails stated: "[w]e have received confirmation that there will be no changes to the Indirect Rate policy flashes. The Department did a review and chose not to make any changes."

118. The Policy Flash, if fully implemented, would harm Plaintiff States because Plaintiff States' agencies will not be able to maintain programs currently supported by SEP and other DOE grants and will be forced to lay off staff, significantly scale back or halt research, and abandon critical projects.

119. If the Policy Flash is applied to Colorado's state fiscal year 2026 SEP formula grant (which runs from July 1, 2025 to June 30, 2026), for example, the loss to Colorado would be approximately $367,000. If applied, the Colorado Energy Office will not be able to adequately support its current staffing needs across several teams. This will severely interfere with Colorado's ability to promote energy efficiency and implement renewable energy across the state, as implementation of the Policy Flash will be deeply damaging to CEO's ability to staff ongoing programs to support energy security, lower energy costs, reduce greenhouse gas pollution, and enable a state-wide transition to clean energy. Should CEO not be able to recover the entire portion

of the requested fringe and indirect costs through SEP funds, it would need to reduce overall headcount and lose crucial services that support Colorado's regulatory work on energy and climate.

120.   If the Policy Flash is applied to Minnesota's 2025 SEP formula funds, the Minnesota Department of Commerce (MDC) would lose approximately $290,000, which reflects the difference between the direct labor fringe costs and the indirect costs for which the state is entitled to reimbursement and the new DOE policy. To cover this shortfall, Minnesota will need to reduce staff paid by these funds and use available funds from other programs more quickly than otherwise planned, leading to budget constraints that will impact the State's ability to meet its statutory energy efficiency and renewable energy objectives.

121.   Kentucky provides DOE funds to electric cooperatives, non-profit community organizations assisting with energy conservation and affordability work, universities providing advanced energy technical assistance and energy education, and expert consultations to advance specific energy initiatives, such as microgrids for resilience and nuclear energy development. Under the indirect cost cap and the inclusion of fringe in those costs, the Commonwealth will have no choice but to limit projects using DOE funding to energy product purchases and other expenses that avoid the use of professional experts and trusted community partners for planning, analysis, and implementation.

122.   Even the United States House of Representatives has noted that DOE's indirect costs policies are deeply harmful, noting that DOE "supports research and development efforts across a vast range of scientific and technological pursuits" that "often require specialized, proprietary, and cutting-edge equipment." As a result, "[a] blanket indirect cost rates policy . . . does not fully address the unique nature of the Department's research and development work."

Accordingly, the House Appropriations Committee expressed that DOE should "pause implementation of its previously announced changes" and "take into account previous indirect cost rates negotiations that have been approved by the Department." H.R. Rep. No. 119-213, at 89-90 (2025).

## VI.    Every Court to Have Ruled on the Merits of Similar Indirect Cost Caps Has Held Them Unlawful

123.    The Policy Flash appears to be a clumsy attempt to circumvent a number of recent Court decisions finding federal agencies—including DOE itself—to have unlawfully reduced indirect costs contrary to the established regulatory scheme.

124.    DOE issued the Policy Flash three weeks after a Court issued a temporary restraining order against its unlawful imposition of a 15% indirect cost cap on institutions of higher education. *Ass'n of Am. Universities v. Dep't of Energy*, No. 25-CV-10912-ADB, 2025 WL 1119791 (D. Mass. Apr. 16, 2025). Since that time, the Court has issued a preliminary injunction and then a final judgment vacating the policy. 2025 WL 1414135 (D. Mass. May 15, 2025) (preliminary injunction); *id.* ECF No. 71 (final judgment and vacatur entered June 30, 2025).

125.    Reviewing DOE's policy, the Court found that it violated 2 C.F.R. § 200.414(c), explaining that that regulation does not contemplate "a one fell swoop approach invalidating all pre-existing NICRAs and changing the well-established procedure for all future grants." 2025 WL 1414135, at *15. The Court also found the rate cap policy at issue to be arbitrary and capricious because it "provide[d] no reasoned explanation for how or why the DOE concluded that indirect cost rates exceeding 15 percent do not constitute an appropriate or efficient use of DOE funds, nor does it explain how limiting funding for indirect costs would lead to that money being put to more appropriate and efficient uses." *Id.* at *12. The Court found this "lack of reasoned explanation . . .

particularly troubling in light of decades of industry reliance on DOE's prior policy." *Id.* at *13 (cleaned up).

126.    Prior to the Policy Flash, a preliminary and then permanent injunction had also already been issued against the National Institute of Health's unlawful imposition of a 15% indirect cost cap on institutions of higher education. *Massachusetts v. Nat'l Insts. of Health*, 770 F. Supp. 3d 277, 287 (D. Mass. 2025) (preliminary injunction); No. 1:25-CV-10338, 2025 WL 1063760, at *2 (D. Mass. Apr. 4, 2025) (permanent injunction). The Court reviewing the NIH policy found that the rate cap at issue in that case "disregard[ed] an existing regulation and regulatory structure" and was arbitrary and capricious based on its conclusory reasoning and failure to grapple with its consequences. 770 F. Supp. 3d at 299-300, 305-07.

127.    A final judgment has been issued vacating a 15% indirect cost cap issued by the National Science Foundation. *Ass'n of Am. Universities v. Nat'l Sci. Found*., No. 1:25-CV-11231-IT, 2025 WL 1725857 (D. Mass. June 20, 2025). Again, that court found that "[w]ith the 15% Indirect Cost Rate, NSF ha[d] rejected the regulatory framework for funding indirect research costs," *id.* at *14, and the policy was arbitrary and capricious because it "express[ed] goals and conclusions, not reasoning," *id.* at *17.[1]

128.    Most recently, a preliminary injunction was issued against the same policy at the Department of Defense. *Ass'n of Am. Universities v. Dep't of Def.*, No. CV 25-11740-BEM, 2025 WL 2022628, at *1 (D. Mass. July 18, 2025) ("The Government has, for the fourth time, purported to announce a policy that has consistently been deemed unlawful, without acknowledgment of its

---

[1] In a separate case challenging NSF's cap, a Court denied a motion for preliminary injunction in light of the decision that had already been issued in *Ass'n of Am. Universities v. Nat'l Sci. Found.* vacating that cap. *See New York v. Nat'l Sci. Found.*, No. 1:25-CV-04452-JPC (S.D.N.Y.), Minute Entry (July 11, 2025).

apparent illegality and without any attempt to structure the policy in a manner that fulfills the established requirements of law.").

129.    DOE issued the Policy Flash with minor differences to the other four policies, none of which are material to its core flaws.

130.    First, DOE styles this Policy Flash as a *cost* cap instead of a *rate* cap at issue in the other cases, *see supra* ¶¶ 123-27. But through the cost cap, DOE is generating the same effect—dramatically cutting off the amount of reimbursement grantees should receive for indirect costs contrary to the regulatory scheme.

131.    Reviewing prior SEP formula awards to Plaintiff States shows that the cost cap will have the same function as a rate cap. But that review requires some math.

132.    As explained above, an indirect cost rate is—both historically, and by regulation—expressed as a percentage of the base direct costs, which can include fringe benefits. *See supra* ¶¶ 56-57. As an example, an award with $80,000 in direct costs (including $16,000 in fringe costs and $64,000 in other direct costs), and a 50% indirect cost rate on all direct costs would result in $40,000 of indirect costs (50% of the $80,000) and thus a total award of $120,000, comprised of $16,000 in fringe, $64,000 in non-fringe direct costs, and $40,000 in indirect costs.

133.    But the Policy Flash uses a novel calculation method. The Policy Flash limits reimbursable indirect and fringe costs to 10% of the *total* award. So, for that $120,000 grant, the total amount of reimbursable indirect and fringe costs would be capped at $12,000, even though there are $16,000 in fringe costs and $40,000 in indirect costs. In this example, DOE would require the State to submit a budget that limits the total of its indirect and fringe costs to $12,000, resulting in a loss of $44,000 in funding that would otherwise have been allowable and allocable. The effect

of this novel calculation is that the previously approved mix of costs is now contrary to the 10% cap imposed by the Policy Flash.

134.    Applying DOE's calculation method to past SEP formula funding awards shows that indirect costs and fringe each often exceed 10% of the total award amounts.

135.    For example, applying DOE's calculation to awards to the New York State Energy Research and Development Authority (NYSERDA) on DOE SEP formula grants from 2022 to 2024, indirect costs ranged from 34% to 40% of the total award amounts. Applying DOE's calculation to awards to NYSERDA on DOE SEP formula grants from 2022 to 2024, fringe benefits costs ranged from 18% to 30% of the total award amounts.

136.    The Oregon Department of Energy (ODOE) receives funding from DOE through State Energy Program ("SEP") grants. In fiscal year 2024, ODOE received $785,910 through the SEP Formula grant program. This included $179,775 in indirect costs and $153,484 in fringe benefits. Thus, in fiscal year 2024, indirect costs represented 22.87% of ODOE's total SEP Formula grant award and fringe benefit costs represented 19.53% of ODOE's total SEP Formula grant award.

137.    The Minnesota Department of Commerce (MDC) also receives SEP funding from DOE. In fiscal year 2024, MDC received $2,461,734.39 through the SEP formula grant program, which included $220,170 in indirect costs and $307,103 in fringe benefits. Thus, in fiscal year 2024, indirect and fringe costs together represented 21.4% of MDC's total grant award.

138.    In state fiscal year 2025, the Colorado Energy Office (CEO) received $960,740 in new funding and $346,558 in unobligated funds from state fiscal year 2024. This included $378,243 in indirect costs and $175,944 in fringe benefits. Thus, in state fiscal year 2025, indirect and fringe benefit costs represented roughly 42% of CEO's total grant award.

139.    The Policy Flash would reduce the sum of indirect costs and fringe benefits costs to no more than 10% total. As these calculations demonstrate, that would be a significant reduction from historical awards, thus functioning as a rate cap.

140.    Second, the Policy Flash claims that States will "continue to utilize their negotiated and approved indirect cost rate(s)," Policy Flash, Ex. 1 at 4, whereas prior policies did not contain such a statement. For example, the vacated DOE policy stated that DOE would "no longer use the negotiated indirect cost rate for grants awarded to IHEs."[2]

141.    But States will not "utilize" their negotiated indirect cost rates as the Policy Flash directs them to use a different, lower rate. Notwithstanding this statement, the Policy Flash in fact forecloses States from utilizing their indirect cost rates because, by capping indirect costs and fringe benefits to 10% of the total award, the policy forces States to adopt a different, lower indirect cost rate. *See also* Fact Sheet, Ex. 4 at 4 (States will need to "determine how to adjust their budget[s] to ensure the cap is not exceeded."); FAL, Ex. 2 at 6 ("Applicants and recipients must ensure that the sum of indirect costs and fringe benefits in the proposed budget do not exceed the maximum percentage allowed against the total award").

142.    Moreover, whether or not a State "utilize[s]" the negotiated rate is legally irrelevant because DOE must *accept* those rates, which, under the Policy Flash, it will not do. *See* Policy Flash, Ex. 1 at 4 ("[T]he Department will establish a maximum dollar amount that it will reimburse under Awards to state and local governments"); *see also* FAL, Ex. 2 at 4-5 ("The maximum amount of funds that may be paid or reimbursed to a recipient for indirect and fringe benefits costs . . .

---

[2] DOE Policy Flash 2025-22 (vacated in *Ass'n of Am. Universities v. Dep't of Energy*, No. 25-CV-10912-ADB, (D. Mass. June 30, 2025)), *available at* https://www.energy.gov/management/pf-2025-22-adjusting-department-energy-grant-policy-institutions-higher-education-ihe.

may deviate from the recipient's negotiated indirect cost rates . . . ."); *id.* at 6 ("If an applicant's

NICRA . . . rate yields higher indirect cost amounts than the . . . limitation allows, the limited

amount must be used.").

143.    Third, although the previous cases involved indirect rate caps imposed on

institutions of higher education rather than to States, that difference is irrelevant because DOE

applies the very same regulations to determine the indirect cost rates it has long negotiated with

state grantees.

144.    Finally, the inclusion of fringe costs within the cap creates an *additional* basis for

liability for DOE. The Policy Flash's 10% cap applies to the total of indirect costs *and* fringe

benefit costs, whereas the prior policies applied only to indirect costs. Doing so contravenes

regulations mandating the reimbursement of fringe benefits. *See supra* ¶¶ 43, 45.

## CAUSES OF ACTION

### Count I

### Administrative Procedure Act, 5 U.S.C. § 706(2)(A)
### Agency Action Contrary to Law

145.    Plaintiff States reallege and incorporate by reference the allegations contained in

each of the preceding paragraphs as if fully set forth herein.

146.    The APA requires a court to "hold unlawful and set aside agency action, findings,

and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law." 5 U.S.C. § 706(2)(A).

147.    DOE is an "agency" under the APA, 5 U.S.C. § 551(1), and the Policy Flash is

"agency action" subject to review under the APA, 5 U.S.C. § 551(13).

148.    The Policy Flash is contrary to law including, but not limited to, in the following

ways:

149.    Because DOE is not calculating awards as the sum of allowable direct and allocable indirect costs, the Policy Flash violates 2 C.F.R. §§ 200.402, 200.403, 200.405.

150.    Because DOE is not accepting State agencies' negotiated indirect cost rates, the Policy Flash violates 2 C.F.R. § 200.414(c).

151.    Because DOE is excluding allowable fringe costs from its calculations of awards, the Policy Flash violates 2 C.F.R. § 200.431.

152.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to an order and judgment, and to a preliminary and permanent injunction, holding unlawful and vacating the Policy Flash and enjoining any act to implement the Policy Flash, including, but not limited to the FAL, June 30 Letter, Fact Sheet, and any communications requiring Plaintiff States to comply with the Policy Flash.

## Count II

### Administrative Procedure Act, 5 U.S.C. § 706(2)(A)
### Arbitrary and Capricious

153.    Plaintiff States reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

154.    The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

155.    DOE is an "agency" under the APA, 5 U.S.C. § 551(1), and the Policy Flash is "agency action" subject to review under the APA, 5 U.S.C. § 551(13).

156.    The Policy Flash is arbitrary and capricious including, but not limited to, in the following ways:

157.    The Policy Flash is conclusory and violates DOE's obligation to examine the relevant data and articulate a satisfactory explanation for the decision, including a rational connection between the facts found and choices made. The Policy Flash offers no explanation for why the indirect cost and fringe benefits cap is set at 10% of the total award amount.

158.    The Policy Flash ignores obvious problems with its categorical 10% cap, including how that cap will thwart the purposes of DOE awards and reduce resource sharing.

159.    The Policy Flash does not explain its substantial change from current practice, which awards indirect costs at the negotiated rate and fringe according to settled accounting principles.

160.    The Policy Flash fails to account for the reliance interests of Plaintiff States and their agencies.

161.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to an order and judgment, and to a preliminary and permanent injunction, holding unlawful and vacating the Policy Flash and enjoining any act to implement the Policy Flash, including, but not limited to, the FAL, June 30 Letter, Fact Sheet, and any communications requiring Plaintiff States to comply with the Policy Flash.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff States pray that this Court:

a.  Enter an order pursuant to 5 U.S.C. § 706(2) holding unlawful and vacating the Policy Flash;

b.  Enter a declaratory judgment finding that the Policy Flash is invalid, arbitrary and capricious, and contrary to law;

c.  Issue preliminary and permanent injunctive relief barring implementation of the Policy Flash in Plaintiff States,[3] including through the FAL, June 30 Letter, Fact Sheet, and any communications requiring Plaintiff States to comply with the Policy Flash, and barring Defendants from otherwise limiting reimbursement for indirect costs or fringe costs in Plaintiff States except as permitted by statute and regulation;

d.  Award Plaintiff States their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

e.  Award such other relief as this Court may deem just and proper.


DATED: August 15, 2025                      _s/ Brian Simmonds Marshall_____

**DAN RAYFIELD**
Attorney General for the State of Oregon
BRIAN SIMMONDS MARSHALL #196129
LEANNE HARTMANN
 #T25070201, Mass. BBO # 667852
Senior Assistant Attorneys General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Email:  Brian.S.Marshall@doj.oregon.gov
         Leanne.Hartmann@doj.oregon.gov

*Attorneys for the State of Oregon*

---

[3] Plaintiff States include relevant subdivisions and instrumentalities.

**LETITIA JAMES**
Attorney General for the State of New York

By: *s/ Rabia Muqaddam*
Rabia Muqaddam
*Chief Counsel for Federal Initiatives*
Jessica Ranucci
*Special Counsel*
28 Liberty St.
New York, NY 10005
(929) 638-0447
rabia.muqaddam@ag.ny.gov
jessica.ranucci@ag.ny.gov

*Attorneys for the State of New York*


**PHILIP J. WEISER**
Attorney General for the State of Colorado

By: s/ *Carrie Noteboom*
Carrie Noteboom
*Assistant Deputy Attorney General*
Jessica L. Lowrey
*First Assistant Attorney General*
Phalen Kohlruss-Reuman
*Assistant Attorney General*
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, CO  80203
(720) 508-6000
carrie.noteboom@coag.gov
jessica.lowrey@coag.gov
phalen.kohlruss@coag.gov
FAX: (720) 508-6040

*Attorneys for the State of Colorado*


**KEITH ELLISON**
Attorney General for the State of Minnesota

By: *s/ Katherine Bies*
Katherine Bies
*Assistant Attorney General*
Minnesota Attorney General's Office
445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
(651) 300-0917
Katherine.Bies@ag.state.mn.us

*Attorney for the State of Minnesota*


**ROB BONTA**
Attorney General for the State of California

By: *s/ Theodore McCombs*
Theodore McCombs
Marie Logan
*Deputy Attorneys General*
California Attorney General's Office
600 W. Broadway, Suite 1800
San Diego, CA 92101
(619) 738-9003
Theodore.McCombs@doj.ca.gov
Marie.Logan@doj.ca.gov

*Attorneys for the State of California*

**WILLIAM TONG**
Attorney General of Connecticut

By: *s/ Jill Lacedonia*
Jill Lacedonia
*Assistant Attorney General*
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5250
Jill.Lacedonia@ct.gov

*Attorney for the State of Connecticut*

**BRIAN L. SCHWALB**
Attorney General for the District of Columbia

By: *s/ Lauren M. Marks*
Lauren M. Marks\*
*Special Assistant Attorney General*
Office of the Attorney General for the District of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 256-3713
Lauren.Marks@dc.gov

\**Admitted only in Michigan; practice supervised by D.C. Bar Members*

*Attorney for the District of Columbia*

**KATHLEEN JENNINGS**
Attorney General for the State of Delaware

By: *s/ Vanessa L. Kassab*
Ian R. Liston
*Director Of Impact Litigation*
Vanessa L. Kassab
*Deputy Attorney General*
Rose E. Gibson
*Assistant Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Attorneys for the State of Delaware*

**ANNE E. LOPEZ**
Attorney General for the State of Hawaiʻi

By: *s/ Kalikoʻonālani D. Fernandes*
David D. Day
*Special Assistant to the Attorney General*
Kalikoʻonālani D. Fernandes
*Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov

*Attorneys for the State of Hawaiʻi*

**KWAME RAOUL**
Attorney General for the State of Illinois

By: *s/ Elena S. Meth*
Cara Hendrickson
*Executive Deputy Attorney General*
Elena S. Meth
*Assistant Attorney General*
Office of the Illinois Attorney General
115 S. LaSalle St.
Chicago, IL 60603
(773) 835-0182
Cara.Hendrickson@ilag.gov
Elena.Meth@ilag.gov

*Attorneys for the State of Illinois*

**OFFICE OF THE GOVERNOR ex rel.**
**Andy Beshear, in his official capacity as**
**Governor of the Commonwealth of**
**Kentucky**

By: *s/ S. Travis Mayo*
S. Travis Mayo
*General Counsel*
Taylor Payne
*Chief Deputy General Counsel*
Laura C. Tipton
*Deputy General Counsel*
Office of the Governor
700 Capitol Avenue, Suite 106
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov

*Attorneys for Office of The Governor* ex rel.
*Andy Beshear*

**AARON M. FREY**
Attorney General for the State of Maine

By: *s/ Caleb Elwell*
Caleb E. Elwell
*Assistant Attorney General*
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333
(207) 626-8545
Caleb.elwell@maine.gov

*Attorney for the State of Maine*

**ANTHONY G. BROWN**
Attorney General for the State of Maryland

By: *s/ Robert N. Brewer*
Robert N. Brewer
*Assistant Attorney General*
Maryland Office of the Attorney General
Federal Accountability Unit
200 Saint Paul Place
Baltimore, MD 21202
(410) 576-6924
rbrewer@oag.state.md.us

*Attorney for the State of Maryland*

**AARON D. FORD**
Attorney General for the State of Nevada

By: *s/ Heidi Parry Stern*
Heidi Parry Stern (Bar. No. 8873)
*Solicitor General*
Office of the Nevada Attorney
General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov

*Attorney for the State of Nevada*


**RAÚL TORREZ**
Attorney General for the State of New
Mexico

By: *s/ Mark Noferi*
Mark Noferi
*Senior Litigation Counsel*
NM Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
(505) 490-4060
MNoferi@nmdoj.gov

*Attorney for the State of New Mexico*


**DANA NESSEL**
Attorney General of Michigan

By: *s/ Neil Giovanatti*
Neil Giovanatti
Polly Synk
*Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
SynkP@michigan.gov

*Attorneys for the State of Michigan*


**JEFF JACKSON**
Attorney General of North Carolina

By *s/ Daniel P. Mosteller*
Laura Howard
*Chief Deputy Attorney General*
Daniel P. Mosteller
*Associate Deputy Attorney General*
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
919-716-6026
dmosteller@ncdoj.gov

*Attorneys for the State of North Carolina*

**JOSH SHAPIRO in his official capacity as Governor of the Commonwealth of Pennsylvania**

By: *s/ Jacob B. Boyer*
Jennifer Selber
*General Counsel*
Jacob B. Boyer
*Deputy General Counsel*
Pennsylvania Office of the Governor
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(717) 460-6786
jacobboyer@pa.gov

*Attorneys for Governor Josh Shapiro*

 **JOSHUA L. KAUL**
Attorney General for the State of Wisconsin

By: *s/ Aaron J. Bibb*
Aaron J. Bibb, Wisconsin State Bar No. 1104662
*Assistant Attorney General*
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
(608) 266-0810
aaron.bibb@wisdoj.gov

*Attorney for the State of Wisconsin*

**NICHOLAS W. BROWN**
Attorney General for the State of Washington

By: *s/ Kate S. Worthington*
Kate S. Worthington, WSBA No. 47556
*Assistant Attorney General*
7141 Cleanwater Drive SW
P.O. Box 40111
Olympia, WA 98504-0111
(306) 709-6470
kate.worthington@atg.wa.gov

*Attorney for the State of Washington*