LETITIA JAMES
Attorney General for the State of New York
Rabia Muqaddam
Chief Counsel for Federal Initiatives
Jessica Ranucci
Special Counsel
28 Liberty St.
New York, NY 10005
(929) 638-0447
Email: rabia.muqaddam@ag.ny.gov
          jessica.ranucci@ag.ny.gov

*Attorneys for the State of New York*

[Additional counsel to appear on signature page]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| STATE OF NEW YORK; STATE OF COLORADO; STATE OF MINNESOTA; STATE OF OREGON; STATE OF CALIFORNIA; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAIʻI; STATE OF ILLINOIS; OFFICE OF THE GOVERNOR, *ex rel.* ANDY BESHEAR, in his official capacity as Governor of the Commonwealth of Kentucky; STATE OF MAINE; STATE OF MARYLAND; STATE OF MICHIGAN; STATE OF NEVADA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; JOSH SHAPIRO, in his official capacity as Governor of the Commonwealth of Pennsylvania; STATE OF WASHINGTON; STATE OF WISCONSIN, | Case No. 6:25-cv-01458-MTK |
| | **PLAINTIFF STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| *Plaintiffs*, | **EXPEDITED HEARING REQUESTED** |
| v. | |
| UNITED STATES DEPARTMENT OF ENERGY; CHRIS WRIGHT, in his official capacity as Secretary of the U.S. Department of Energy, | |
| *Defendants*. | |

Page i – PLAINTIFF STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................................................................ iv

LR 7-1 CERTIFICATION............................................................................................... 1

MOTION........................................................................................................................ 1

MEMORANDUM OF LAW .......................................................................................... 2

BACKGROUND ........................................................................................................... 3

   I.   Plaintiff States' DOE Funding Enhances Energy Security and Affordability.................... 3

   II.   Regulations Governing Federal Grant Funding for Indirect Costs and Fringe Benefits .... 5

      A.   Allowable and Allocable Costs................................................................. 5

      B.   Direct vs. Indirect Costs........................................................................... 6

      C.   Indirect Cost Rates.................................................................................... 7

      D.   Fringe Benefit Costs ................................................................................. 9

      E.   Cost Sharing .............................................................................................. 10

   III.   DOE's Policy Flash.......................................................................................11

   IV.   Impact of Policy Flash on Plaintiff States' Energy Programs........................... 14

ARGUMENT .................................................................................................................. 17

   I.   The Court Has Jurisdiction Over This Action.................................................... 18

   II.   The Policy Flash is Contrary to Law in Violation of the APA........................... 19

      A.   The Policy Flash is Subject to Review Under the APA. ................................. 19

      B.   It is Contrary to Law for an Agency to Violate Its Own Regulations........................... 20

      C.   The Policy Flash and its Implementation Violate Several Provisions of 2 C.F.R. § 200.414 ................................................................................... 21

Attorney General for the State of New York
28 Liberty St.
New York, NY 10005
(929) 638-0047

D.    The Policy Flash Unlawfully Limits Fringe Benefits, in Violation of the Regulatory Scheme for Determining Allowable Fringe Costs........................................................ 27

E.    The Policy Flash Violates the Basic Principle that All Federal Awards Are Comprised of the Sum of Allowable and Allocable Costs, Effectively Imposing Unlawful Cost Sharing ............................................................................................................................ 29

CONCLUSION............................................................................................................................. 30

Attorney General for the State of New York
28 Liberty St.
New York, NY 10005
(929) 638-0047

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AAU v. Dep't of Energy*,
    No. 25-cv-10912-ADB, 2025 WL 1414135 (D. Mass. May 15, 2025) ............. 8, 11, 18, 22-25

*AAU v. Nat'l Sci. Found.*,
    No. 25-cv-11231-IT, 2025 WL 1725857 (D. Mass. June 20, 2025) .................. 1, 11, 23-24, 30

*Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt.*,
    No. 25-cv-1237 (DLC), 2025 WL 1621714 (S.D.N.Y. June 9, 2025) ...................................19

*Ass'n of Am. Univs. (AAU) v. Dep't of Def.*,
    No. 25-11740-BEM, 2025 WL 2022628 (D. Mass. July 18, 2025) ...............5-7, 10-11, 26-30

*Ass'n of Irritated Residents v. U.S. Env't Prot. Agency*,
    10 F.4th 937 (9th Cir. 2021) ...........................................................................................18

*Bennett v. Spear*,
    520 U.S. 154 (1997)..........................................................................................................19

*Doe v. Noem*,
    778 F. Supp. 3d 1151 (W.D. Wash. 2025)..............................................................................20

*E. Bay Sanctuary Covenant v. Biden*,
    993 F.3d 640 (9th Cir. 2021) ...........................................................................................17

*FCC v. NextWave Pers. Commc'ns Inc.*,
    537 U.S. 293 (2003)..........................................................................................................20

*Loffman v. Cal. Dep't of Educ.*,
    119 F.4th 1147 (9th Cir. 2024) .........................................................................................18

*Massachusetts v. Nat'l Insts. of Health (NIH)*,
    770 F. Supp. 3d 277 (D. Mass. 2025) ......................................................................11, 18, 23

*Massachusetts v. NIH*,
    Nos. 25-cv-10338 et al., 2025 WL 1063760 (D. Mass. Apr. 4, 2025) ...................................11

*Nat'l Ass'n of Home Builders v. Norton*,
    340 F.3d 835 (9th Cir. 2003) ...........................................................................................20

Attorney General for the State of New York
28 Liberty St.
New York, NY 10005
(929) 638-0047

*National Institutes of Health v. American Public Health Association*,
    No. 25A103 (Aug. 21, 2025) ................................................................18

*New York v. NSF*,
    No. 25 Civ. 4452, 2025 WL 2180478 (S.D.N.Y. Aug. 1, 2025) ............................................11

*Or. Council for Hums. v. U.S. DOGE Serv.*,
    No. 3:25-cv-829-SI, 2025 WL 2237478 (D. Or. Aug. 6, 2025) ............................................18

*Or. Nat. Desert Ass'n v. Bushue*,
    644 F. Supp. 3d 813 (D. Or. 2022) ......................................................17

*Prutehi Litekyan: Save Ritidian v. U.S. Dep't of the Airforce*,
    128 F.4th 1089 (9th Cir. 2025) ........................................................19

*Saliba v. U.S. Sec. & Exch. Comm'n*,
    47 F.4th 961 (9th Cir. 2022) ..........................................................19

*Victim Rts. L. Ctr. v. U.S. Dep't of Educ.*,
    No. 25-11042-MJJ, 2025 WL 1704311 (D. Mass. June 18, 2025)..........................................20

**Federal Statutes**

5 U.S.C.
    § 704....................................................................................19
    § 706..............................................................................1, 17, 30

31 U.S.C. § 503 ............................................................................5

42 U.S.C. § 6323 ...........................................................................3

Administrative Procedure Act.................................................................2

Infrastructure Investment and Jobs Act, Pub. L. No. 117-58
    § 40109, 135 Stat. 429, 944–45 (2021)................................................. 3-4

Energy Policy and Conservation Act, Pub. L. No. 94-163
    §§ 361–63, 89 Stat. 871, 932–35 (1975)...............................................3

Attorney General for the State of New York
28 Liberty St.
New York, NY 10005
(929) 638-0047

**Federal Regulations**

2 C.F.R.

    pt. 200 ........................................................................................................ 4-8, 27

    § 200.1................................................................................................8-10, 24-25

    § 200.402 ..................................................................................................... 10, 28

    § 200.403 ................................................................................................5, 10, 28

    § 200.405 ......................................................................................................5, 10

    § 200.411 ...........................................................................................................27

    § 200.412 ...........................................................................................................26

    § 200.413 .......................................................................................................6, 27

    § 200.414 ..................................................................................................... *passim*

    § 200.416 .............................................................................................................7

    § 200.431 .......................................................................................................9, 28

    § 910.120 .............................................................................................................4


10 C.F.R. § 420.11 .......................................................................................... 3-4

Attorney General for the State of New York
28 Liberty St.
New York, NY 10005
(929) 638-0047

## **LR 7-1 CERTIFICATION**

Plaintiffs' counsel certify that the parties conferred via videoconference regarding this motion and have been unable to resolve the issue. The parties further conferred regarding Plaintiff States' request to expedite consideration of the motion; the Federal Defendants oppose expedited consideration.

## **MOTION**

Plaintiff States move under Rule 56(a) for entry of partial summary judgment in their favor on Count I of their Complaint (Administrative Procedure Act, 5 U.S.C. § 706(2)(A), Agency Action Contrary to Law). This motion is supported by the following memorandum of law and the declarations and exhibits filed simultaneously with this motion.

Plaintiffs also request an expedited hearing of this motion given the dramatic effects of the challenged policy, which is already in place. Plaintiffs request that the Court order that the Federal Defendants' response to the motion is due on September 15, that Plaintiffs' reply is due September 25, and that the Court set a hearing at its earliest availability thereafter. Since the filing of this case and in the parties' conferral, Plaintiffs have sought the agency's agreement to voluntarily stay the policy[1] pending resolution of this motion in lieu of expedited consideration; the Federal Defendants have not yet determined their position on that request.

---

[1]In a challenge to a similar policy imposed by the National Science Foundation, the government agreed to voluntarily stay the policy while its legality was adjudicated. *AAU v. Nat'l Sci. Found. (NSF)*, No. 25-cv-11231-IT, 2025 WL 1725857, at *6 (D. Mass. June 20, 2025).

Page 1 – PLAINTIFF STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT

## **MEMORANDUM OF LAW**

Plaintiffs seek summary judgment on their claim that a recently issued Department of Energy (DOE) policy limiting the reimbursement grantees receive under DOE awards is contrary to law under the APA. The challenged policy, announced in DOE Policy Flash 2025-25 (the "Policy Flash"), applies to all grant awards from DOE to State and local governments and limits the reimbursement of indirect costs and fringe benefit costs to a maximum of 10% of the total project award amount. This policy contradicts the longstanding regulatory framework DOE is required to follow for allocating States' indirect costs, which dictates that DOE must generally apply the indirect cost rate that is negotiated by each State agency. The Policy Flash further contravenes both the letter and principle of the regulatory scheme governing federal grants, which mandate that an award be comprised of all allowable direct costs and allocable indirect costs.

DOE is the fourth federal agency since January to attempt to evade this framework. All four of those agencies—*including DOE itself* in a separate case brought by universities challenging a similar policy—have thus far failed to convince a single court that their actions are consistent with the law. The outcome should be no different in this case. Although DOE attempts more complex mathematical gymnastics in capping reimbursement here than federal agencies have before, the legal issues are just as straightforward. A comprehensive and well-worn regulatory scheme governs how costs, including indirect and fringe costs, are reimbursed under federal awards.

The few factual differences present here only further underscore the unlawfulness of DOE's policy. First, in what may be a clumsy attempt to distinguish earlier failures, DOE purports to cap the *amount* of indirect costs, instead of reducing the applicable indirect cost *rate*. But, practically speaking, the result is the same: by forcing States to submit a much smaller amount of indirect

Page 2 – PLAINTIFF STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT

costs for reimbursement than the amount the regulatory scheme requires DOE to reimburse, DOE is unlawfully disregarding those binding rates. Second, the Policy Flash also lumps fringe benefit costs in with indirect costs, limiting the "maximum allowable dollar amount" that DOE will reimburse for both types of expenditures combined to just 10% of the total award amount, which violates regulations governing the reimbursement of fringe benefits.

The Policy Flash is contrary to the regulatory scheme and thus violates the Administrative Procedure Act. For these reasons, Plaintiffs are entitled to summary judgment and the Policy Flash should be enjoined and set aside.

## BACKGROUND

### I.    Plaintiff States' DOE Funding Enhances Energy Security and Affordability

For decades, Plaintiff States have played a critical role in advancing the nation's energy security and affordability. These state-led efforts were undertaken with the help of federal funding through DOE. Collectively, Plaintiff States receive hundreds of millions of dollars from DOE through several different grant programs. *See*, *e.g.*, Benner-OR Decl. ¶ 27; DeNicola-CT Decl. ¶ 25; Fontaine-WI Decl. ¶ 21; Goodman-KY Decl. ¶ 22; Pawlisch-MN Decl. ¶ 22; Schwing-HI Decl. ¶ 20; McDonald-MI Decl. ¶ 20; Gomez-CO Decl. ¶ 29; Poisson-NY Decl. ¶ 26. These programs serve critical State needs. For example, in Oregon, DOE funds the Oregon Department of Energy to assist with the cleanup and remediation of risks at the Hanford Nuclear Site, a former plutonium manufacturing site that contains numerous contaminated buildings and 56 million gallons of toxic radioactive sludge stored in aging underground tanks not far from the Columbia River. Benner-OR Decl. ¶¶ 18-19.

In the 1970s, Congress established the State Energy Program (SEP) as part of the Energy Policy and Conservation Act, *see* Pub. L. No. 94-163, §§ 361–63, 89 Stat. 871, 932–35 (1975)

Page 3 – PLAINTIFF STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT

(codified at 42 U.S.C. §§ 6321–23), and directed DOE to provide States with financial and technical assistance to develop and implement state energy conservation plans, *see* 42 U.S.C. § 6323(a)–(b); DOE, State Energy Program Operations Manual ("DOE Operations Manual") at 5.[2] Over the years, Congress has repeatedly appropriated—and increased—funding for these types of state initiatives. *See* DOE Operations Manual at 5–6; Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, § 40109, 135 Stat. 429, 944–45 (2021).

Currently, the SEP provides millions of dollars of financial and technical assistance to states through formula and competitive grants. *See* DOE Operations Manual App'x A; *see also* 10 C.F.R. § 420.11 (setting forth State formula grant allocation amounts). Plaintiff States use their SEP formula grants to implement a wide range of state strategies for meeting their energy priorities. For example, Delaware uses its SEP award funds to employ staff responsible for, among other things, statewide energy planning and assessment, legislation drafting, and administering Delaware's Weatherization Assistance Program. Swan-DE Decl. ¶ 14. And Illinois uses its SEP award funds to, among other things, fund an energy audit program, which works to reduce energy costs for utility customers. Poeschel-IL Decl. ¶ 8(d); *see also* Martin-Gallardo-CA Decl. ¶¶ 12–13; DeNicola-CT Decl. ¶ 17; Nguyen-WA Decl. ¶¶ 16–17. For Fiscal Years 2022 to 2026, Congress appropriated $500 million in SEP formula funds to distribute to States. DOE Operations Manual at 6; Infrastructure Investment and Jobs Act § 40109; 10 C.F.R. § 420.11.

Beyond the SEP, DOE provides substantial funding to States to administer a host of programs that improve energy efficiency and provide critical benefits to State residents. For

---

[2] Available at https://www.energy.gov/sites/default/files/2024-12/scep-sep-operations-manual-2024.pdf.

Page 4 – PLAINTIFF STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT

example, States use DOE funding for the Weatherization Assistance Program (WAP) to reduce energy costs for low-income households by increasing the energy efficiency of their homes while ensuring their health and safety. The program supports 8,500 jobs and provides weatherization services to approximately 32,000 homes every year.[3] The WAP also provides insulation and energy efficiency upgrades to income-qualified Colorado households with the primary goal of helping reduce energy bills. Gomez-CO Decl. ¶ 30; *see also* Divan-OR Decl. ¶ 5.

## II.    Regulations Governing Federal Grant Funding for Indirect Costs and Fringe Benefits

DOE grant funding to States is subject to a robust regulatory framework promulgated by the Office of Management and Budget (OMB), *see* 2 C.F.R. pt. 200, and adopted by DOE, *see* 2 C.F.R. § 910.120.[4] This framework "establishes basic principles and procedures for federal grant accounting." *Ass'n of Am. Univs. (AAU) v. Dep't of Def.*, No. 25-11740-BEM, 2025 WL 2022628, at *2 (D. Mass. July 18, 2025).

### A.    Allowable and Allocable Costs

As an initial matter, all costs must meet certain criteria to be "allowable" under Federal awards.  2 C.F.R. § 200.403. "Allowable costs—in other words, what the Government *will* pay for—must, among other requirements, be 'necessary and reasonable'; must 'conform to any limitations or exclusions'; must be consistently accounted for; and must be 'adequately

---

[3] Available at https://www.energy.gov/scep/wap/weatherization-assistance-program.

[4] OMB is required by Congress to "establish general management policies for executive agencies," including policies governing grant management. 31 U.S.C. § 503(b)(2)(C). OMB has, accordingly, established uniform administrative requirements, cost principles, and audit requirements for federal awards, codified in 2 C.F.R. part 200. Appendix VII to 2 C.F.R. part 200 provides the "[s]pecific methods for allocating indirect costs and computing indirect cost rates" for states, local governments, and Indian tribes.

Attorney General for the State of New York
28 Liberty St.
New York, NY 10005
(929) 638-0047

documented.'" *Dep't of Def.*, 2025 WL 2022628, at *3 (quoting 2 C.F.R. § 200.403) (emphasis in original). On the other hand, "unallowable" costs are costs that the Government "will *not* pay for— for example, entertainment costs are generally unallowable." *Id.* (citing 2 C.F.R. § 200.438) (emphasis in original). Thus, "allowability dictates *what* costs can be reimbursed using grant funds." *Id.*

Costs must also be "allocable," meaning that they must be—at least in part—attributable to the specific project an award is for. Allocation is the commonsense principle that costs, even if of the type that are generally "allowable" by a federal agency, can only be allocated to the awards they relate to, and cannot be allocated to awards they do not relate to. A cost is "allocable" so long as it satisfies the basic criteria set forth in 2 C.F.R. § 200.405, including that the cost "[i]s incurred specifically for the Federal award," *id.* § 200.405(a)(1), or "[i]s necessary to the overall operation of the recipient or subrecipient and is assignable in part to the Federal award," *id.* § 200.405(a)(3).

## B. Direct vs. Indirect Costs

Federal regulations set forth two types of allowable costs: direct and indirect costs. These categories are "a function of accounting and of the principles set forth in the [regulatory framework]." *Dep't of Def.*, 2025 WL 2022628, at *3. Direct costs are costs that are attributable to a specific project supported by federal (here, DOE) funding. 2 C.F.R. § 200.413(a). Direct costs may include, for example, salaries and wages of employees engaged in approved program work. *See*, *e.g.*, Gomez-CO Decl. ¶ 11.

Indirect costs, by contrast, are costs that "have been incurred for common or joint purposes" and therefore cannot be attributed and allocated directly to a specific project. 2 C.F.R. pt. 200 App'x VII ¶ A(1); *see also* 2 C.F.R. § 200.414. Indirect costs include both facilities costs (such as building depreciation and capital improvements) and administration costs (such as a

Attorney General for the State of New York
28 Liberty St.
New York, NY 10005
(929) 638-0047

director's office, accounting, and personnel). *See* 2 C.F.R. § 200.414(a). Indirect costs may include, for example, payroll for centralized agency support staff, day-to-day operations and maintenance of buildings, utilities, office supplies, equipment, and noncapitalized IT and software programs. *See*, *e.g.*, Gomez-CO Decl. ¶ 22; Pawlisch-MN Decl. ¶ 19; Poisson-NY Decl. ¶¶ 22–24; Nguyen-WA Decl. ¶ 21; Poeschel-IL Decl. ¶ 19; Goodman-KY Decl. ¶ 17. These types of expenses are necessary to fully implement the policies and programs funded by DOE awards. *See*, *e.g.*, Gomez-CO Decl. ¶ 22; Pawlisch-MN Decl. ¶ 19; Poisson-NY Decl. ¶ 22; Fontaine-WI Decl. ¶¶ 15, 18; Benner-OR Decl. ¶ 23.

### C. Indirect Cost Rates

The governing regulations provide a detailed process by which indirect costs are determined. Specifically, each State agency negotiates an indirect cost rate with the federal agency from which the State agency receives its largest award of federal grants, called the "cognizant federal agency." 2 C.F.R. pt. 200 App'x VII ¶¶ B(3), D(1)(b); *id.* App'x V ¶ F(1); *see also* 2 C.F.R. § 200.416(b). This process requires the State agency to prepare and submit an indirect cost rate proposal along with supporting documentation to its cognizant federal agency. 2 C.F.R. pt. 200 App'x VII ¶¶ D(1)(a)–(b). Indirect cost proposals must include the proposed rates and the financial data upon which the rates are based. *Id.* ¶¶ D(2)(a)–(b). Indirect cost rates are then reviewed, negotiated, and approved by the cognizant federal agency. *Id.* ¶ E(1). At the conclusion of the negotiation, the State agency's indirect cost rate is formalized in a written agreement called a Negotiated Indirect Cost Rate Agreement (NICRA). *Id.* ¶ E(3).

A State agency's indirect cost rate is expressed as a percentage of the applicable direct cost base. *See Dep't of Def.*, 2025 WL 2022628, at *4; 2 C.F.R. pt. 200 App'x VII ¶B(1), (7). As a simple example, an award with $80,000 in direct costs and a 50% indirect cost rate on all direct

Page 7 – PLAINTIFF STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT

costs would result in $40,000 of indirect costs (50% of the $80,000) and thus a total award of $120,000.

Plaintiff States' energy agencies have negotiated indirect cost rates that were set using the negotiation process described above and are memorialized in NICRAs ranging, typically, from approximately 15% to 45%. *See, e.g.*, McDonald-MI Decl. ¶ 14; Poeschel-IL Decl. ¶ 17; Nguyen-WA Decl. ¶ 19; Martin-Gallardo-CA Decl. ¶ 15; Gomez-CO Decl. ¶ 20; Poisson-NY Decl. ¶ 19; Pawlisch-MN Decl. ¶ 16; Fontaine-WI Decl. ¶ 16; Pinsky-MD Decl. ¶ 19; Benner-OR Decl. ¶ 21; Woosley-NC Decl. ¶ 18. The rates vary between states because they are based on States' actual, documented indirect costs, which are not all the same. *Cf. AAU v. Dep't of Energy*, No. 25-cv-10912-ADB, 2025 WL 1414135, at *2 (D. Mass. May 15, 2025) (noting that "negotiated rates vary significantly from institution to institution" because "certain types of research are more expensive than others").

Critically, a State agency's negotiated indirect cost rate binds the entire federal government, often for multiple years. *See* 2 C.F.R. § 200.414(c)(1); 2 C.F.R. pt. 200 App'x ¶ VII(E)(1). A federal agency such as DOE is required to "accept" the negotiated rate unless it can demonstrate that, "for either a class of Federal awards or a single Federal award," "deviation" from the negotiated rate is: (1) "required by Federal statute or regulation," or (2) "approved . . . in accordance with [2 C.F.R. § 200.414(c)(3)]." 2 C.F.R. § 200.414(c)(1). To avail itself of the second, narrow exception under 2 C.F.R. § 200.414(c)(3), DOE must "implement, and make publicly available, the policies, procedures and general decision-making criteria that their programs will follow to seek and justify deviations from negotiated rates." DOE must also include the policies relating to indirect cost rate in the notice of funding opportunity. *Id.* § 200.414(c)(4).

Page 8 – PLAINTIFF STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT

Alternatively, a State agency without a NICRA may "elect to charge a de minimis rate" for indirect costs "of up to 15 percent." *Id.* § 200.414(f). But a Federal agency "must not compel" a State agency to "accept the de minimis rate." 2 C.F.R. pt. 200 App'x VII ¶ D(1)(c).

In some cases, a State agency serves as a "pass-through entity," which is a grantee "that provides a subaward to a subrecipient . . . to carry out part of a Federal program." 2 C.F.R. § 200.1. In this circumstance, the State agency must "accept[]" its subrecipient's negotiated indirect cost rate. 2 C.F.R. § 200.414(d).

### D.  Fringe Benefit Costs

These federal regulations also describe the treatment of specific cost items, such as (as relevant here) fringe benefits for employees. *See id.* § 200.431. Fringe benefits "are allowances and services employers provide to their employees as compensation in addition to regular salaries and wages," such as "the costs of leave, employee insurance, pensions, and unemployment benefits." *Id.* § 200.431(a). These expenses are also necessary to carry out program goals and objectives funded by DOE awards. *See*, *e.g.*, Gomez-CO Decl. ¶¶ 22–24; Pawlisch-MN Decl. ¶¶ 19, 22; Poisson-NY Decl. ¶ 22; Schwing-HI Decl. ¶¶ 17–18; Goodman-KY Decl. ¶¶ 17–18; Althoff-PA Decl. ¶ 26.

Fringe costs may be considered direct or indirect costs depending on the grant recipient's accounting practices and the above-described guidelines for classifying direct or indirect costs. *See*, *e.g.*, 2 C.F.R. § 200.1 (defining modified total direct costs to include "applicable fringe benefits"); *id.* § 413(b) ("Costs charged directly to a Federal award are typically incurred specifically for that Federal award (including, for example, . . . the proportion of employee compensation and fringe benefits expended in relation to that specific award)."); *id.* § 200.431

Attorney General for the State of New York
28 Liberty St.
New York, NY 10005
(929) 638-0047

(describing treatment of fringe benefits and noting that certain fringe benefits can be "charged as direct or indirect costs following the recipient's . . . accounting practices").

The regulations dictate how the principle of allowability is applied to fringe benefit costs. *Id.* §§ 200.420(b), 200.431. Generally, fringe benefit costs are "allowable" if the benefits are "reasonable" and are "required by law, an organization-employee agreement, or an established policy of the recipient or subrecipient." *Id.* § 200.431(a). The regulations specify how to calculate allowable fringe benefits costs for different types of fringe benefits, including vacation and holiday pay, *id.* § 200.431(b), employer-sponsored health insurance, *id.* § 200.431(c), severance, pensions, and the like, *see id.* § 200.431(e)–(i).

### E.  Cost Sharing

The total amount of a DOE award is the sum of allowable direct costs and allocable indirect costs. *Id.* § 200.402. As described above, a cost is "allowable" so long as it meets the basic criteria set forth in 2 C.F.R. § 200.403, which include, for example, that the cost is adequately documented and necessary and reasonable for the performance of the federal award. A cost is "allocable" so long as it is attributable (in full or in part) to the award. *Id.* § 200.405. Importantly, "*[a]ll* activities which benefit from the recipient's or subrecipient's indirect cost . . . will receive an appropriate allocation of indirect costs." *Id.* § 200.405(b) (emphasis added).

The government is required to pay allowable, allocable costs unless it mandates "cost sharing" in compliance with the relevant regulations. "Cost sharing" is the "portion of project costs not paid by Federal funds or contributions." *Id.* § 200.1. "Cost sharing thus provides an analytic complement to the principles already discussed: allowability establishes *what* can be reimbursed;" whether a cost is direct or indirect determines *under which category* it will be reimbursed; and

Page 10 – PLAINTIFF STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT

"cost sharing fixes *how much* of the total will be reimbursed." *Dep't of Def.*, 2025 WL 2022628, at *5 (emphasis in original).

The regulatory framework includes a "clear presumption against (and specific procedures in the case of) mandatory cost sharing." *Id.* at *6. To mandate cost sharing, the federal agency must explicitly state that it is doing so in its notice of funding opportunity, 2 C.F.R. § 200.414(c)(4), and in the actual award, *id.* § 200.211(9). Federal agencies are "discouraged from using voluntary committed cost sharing as a factor during the merit review of applications" and are in fact prohibited from using voluntary cost sharing as a factor when reviewing applications unless authorized by federal statute or agency regulations and specified in the notice of funding opportunity. *Id.* § 200.306(a). Cost sharing is also subject to accounting and audit requirements. *See id.* § 200.306(b)–(k).

## III.    DOE's Policy Flash

In early 2025, several federal agencies, including DOE, began to cap indirect cost rates in federal grants to institutions of higher education, notwithstanding the institutions' negotiated (and legally binding) rates with the federal government. These rate caps were swiftly struck down by federal courts.[5]

---

[5] *AAU v. Dep't of Energy*, No. 25-cv-10912-ADB, 2025 WL 1414135, at *15 (D. Mass. May 15, 2025) (preliminary injunction), *id.* Dkt. No. 71 (final judgment and vacatur); *Massachusetts v. Nat'l Insts. of Health (NIH)*, 770 F. Supp. 3d 277, 299 (D. Mass. 2025) (preliminary injunction); *Massachusetts v. NIH*, Nos. 25-cv-10338 et al., 2025 WL 1063760, at *2 (D. Mass. Apr. 4, 2025) (permanent injunction); *AAU v. Nat'l Sci. Found. (NSF)*, 2025 WL 1725857, at *14 (final judgment and vacatur); *AAU v. Dep't of Def.*, No. cv 25-11740-BEM, 2025 WL 2022628, at *17 (D. Mass. July 18, 2025) (preliminary injunction). In a separate case challenging NSF's cap, a court denied a motion for a preliminary injunction in light of the decision that had already been issued in *AAU v. NSF* vacating that cap. *See New York v. NSF*, No. 25 Civ. 4452, 2025 WL 2180478 (S.D.N.Y. Aug. 1, 2025).

Attorney General for the State of New York
28 Liberty St.
New York, NY 10005
(929) 638-0047

On May 8, 2025, despite having just been restrained from implementing a similar policy for institutions of higher education in *AAU v. Department of Energy*, *supra* n.5, DOE issued the Policy Flash, formally titled "2025-25 Adjusting Department of Energy Financial Assistance Policy for State and Local Governments' Financial Assistance Awards." Ex. 1.[6] The Policy Flash caps the reimbursement for total indirect costs *and* fringe benefits for DOE grants to state and local governments to 10% of the total project award amount. *Id.* at 4. The Policy Flash applies not only to "New Awards," that is, "Awards issued under Notices of Funding Opportunity yet to be released," but also to "Conditional Awards," that is, "awards for prior Notices of Funding Opportunity or Funding Opportunity Announcements where negotiations are not yet complete and/or the Award has not been executed." *Id.* at 3. The Policy Flash applies to all new and conditional awards to State and local governments. *Id.*

DOE's explanation for this drastic policy change spanned only two paragraphs. Although DOE acknowledged that "many Award recipients use indirect cost payments to effectuate activities funded by the Department's financial assistance awards," the Policy Flash asserted that these "indirect costs" "are not for funding the Department's direct project activities." *Id.* at 2.  DOE also purported to justify the Policy Flash on the basis that "the Department must ensure it is putting funds to appropriate use." *Id.* at 3. But it made no attempt to explain why indirect costs and fringe benefits that were negotiated on the basis of documented evidence and that satisfy the regulatory requirements are now inappropriate. And DOE asserted that the policy is intended to "improve efficiency," without further elaboration. *Id.*

---

[6] Exhibits 1–5 are attached to the Declaration of Jessica Ranucci.

Page 12 – PLAINTIFF STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT

On June 30, 2025, DOE issued guidance regarding the Policy Flash, a financial assistance letter titled "FAL 2025-05, Implementation of Indirect and Fringe Benefits Cost Reimbursement Limits on Financial Assistance Awards" (the "FAL," Ex. 2). The FAL implemented the Policy Flash and had immediate effect. *Id.* at 1.

The FAL reiterated the Policy Flash's directive that the "maximum amount of funds" that may be reimbursed to a "recipient for indirect and fringe benefits costs will be calculated as a percentage of the project's Total Award Amount" and further prescribed that, for State and local Governments, that cap is "10% of the Total Award Amount." *Id.* at 4. The FAL directed grants officers to include boilerplate language in each notice of funding opportunity that sets forth this new cap; to "[e]nsure that each initial and subsequent negotiated and approved budget includes the appropriate percentage limit"; and to include boilerplate language enforcing this cap "in all applicable financial assistance awards" themselves. *Id.* at 5. The FAL explained that the reimbursement limit also applies to the States' subrecipients. *Id.* at 6, 8–9.

The FAL also made clear that DOE will not accept funding applications that exceed the cap. The required notice of funding opportunity language set forth in the FAL states that "[a]pplicants and recipients must ensure that the sum of indirect costs and fringe benefits in the proposed budget do not exceed the maximum percentage allowed against the total award" and that "[t]his limit applies regardless of an applicant's negotiated indirect cost rate agreement (NICRA)." *Id.* at 6. "If an applicant's NICRA or de minimis rate yields higher indirect cost amounts than" the limitation allows, "the limited amount must be used" in the application. *Id.*

DOE also began sending a letter ("June 30 Letter," example attached as Ex. 3) to some Plaintiff States describing the Policy Flash and enclosing a fact sheet containing responses to "Frequently Asked Questions" regarding the Policy Flash ("Fact Sheet," Ex. 4) and Narrative

Page 13 – PLAINTIFF STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT

Calculation Guidance comprised of an eight-step calculation procedure and an example calculation spreadsheet (Ex. 5).

## IV.   Impact of Policy Flash on Plaintiff States' Energy Programs

Plaintiff States' energy agencies depend heavily on DOE funding to staff and implement a wide array of critical energy and environmental programs, and the Policy Flash is already affecting States' programs.

DOE has already begun to apply the Policy Flash to Plaintiff States, starting with the millions of dollars of formula funds provided to States under the SEP, which Plaintiff States use to fund a wide range of state strategies for meeting their energy priorities. *See supra* Background Part I. After DOE issued the Policy Flash, DOE rejected many of the budgets that Plaintiff States had proposed for the next program year and instructed the States that the budgets "must be adjusted to conform with" the Policy Flash. *See*, *e.g.*, Poeschel-IL Decl. ¶¶ 13–14; Martin-Gallardo-CA Decl. ¶ 7; Swan-DE Decl. ¶ 8; Nguyen-WA Decl. ¶ 11; DeNicola-CT Decl. ¶ 12; Poisson-NY Decl. ¶ 8; Benner-OR Decl. ¶¶ 8–9; Schwing-HI Decl. ¶ 8; Woosley-NC Decl. ¶ 10.

The Policy Flash will cause harm to Plaintiff States due to its immediate impact on the SEP unless relief is granted in this action.  For example:

- Oregon uses SEP funds to promote energy efficiency across sectors throughout the state, "increas[ing] the availability of firm electricity in the state, reduc[ing] energy security risks, [] lower[ing] energy costs for Oregonians, and support[ing] educational efforts regarding a variety of energy topics." Benner-OR Decl. ¶ 15. Oregon's Department of Energy strives to accomplish those goals in a cost-effective way, utilizing "highly trained and specialized public servants, as opposed to costly contracts" to ensure it carefully stewards taxpayer dollars. *Id.* ¶ 29. The Policy Flash will require the state to find other funds to cover the implementation of the program or utilize more costly contractors, hindering those efforts. *Id.*

- The Delaware Department of Natural Resources and Environmental Control relies on SEP funds to staff projects aimed at, among other things, "renewable and energy efficiency policy" and "statewide energy planning assessment." Swan-DE Decl. ¶ 14. The Policy Flash will affect Delaware's "ability to accomplish [its] renewable

Attorney General for the State of New York
28 Liberty St.
New York, NY 10005
(929) 638-0047

energy and energy efficiency objectives," and has already caused Delaware "to eliminate one full time employee from the grant budget." *Id.* ¶ 21.

- The Minnesota Department of Commerce uses SEP funds to fund staff who provide critical information to innovators, investors, policy makers, regulators, and consumers, and who provide technical assistance focused on deploying Minnesota's energy resources to meet growing demand and drive economic development. Pawlisch-MN Decl. ¶ 9. Without funding for the centralized staff who provide essential support services for this work, Minnesota cannot complete these projects and goals. *Id.* ¶ 19. To comply with the Policy Flash, Minnesota was "forced to utilize dollars from other program areas more quickly than otherwise planned to cover some of this loss." *Id.* ¶ 25.

- The New York State Energy Research and Development Authority uses SEP funds to "support New York State energy planning activities, policy analysis, data and statistics, strategic planning, energy assurance and security, and energy emergency planning and response." Poisson-NY Decl. ¶ 16. Once the Policy Flash is applied, the resulting reduction in funding "will have deeply damaging effects on [New York's] ability to perform the robust energy security functions" the state requires and will impact 26 staff members who are "critically engaged in New York's energy planning, safety and security, and energy resilience efforts." *Id.* ¶ 28.

- The Michigan Department of Environment, Great Lakes, and Energy uses SEP funding to "[u]pdate the State Energy Security Plan, to incorporate the improvement of emergency response measures, energy infrastructure information and critical infrastructure protection, assess the petroleum and fuel supply resilience, and address cybersecurity." McDonald-MI Decl. ¶ 12(d); *see also id.* ¶ 12 (describing other SEP-funded programs in Michigan). But the Policy Flash will "force[]" Michigan "to reduce staffing levels—resulting in fewer SEP-funded projects and diminished program impact." *Id.* ¶ 22.

- The Illinois Environmental Protection Agency uses SEP funding to "[i]nvest in the Illinois Clean Energy Innovation Fund, a revolving loan fund that supports the development and deployment of emerging energy technologies that enhance grid reliability, resilience, and modernization." Poeschel-IL Decl. ¶ 8(c); *see also id.* ¶ 8 (describing other SEP-funded programs in Illinois). But with the Policy Flash, Illinois "would be forced to significantly alter its programming for the coming fiscal year." *Id.* ¶ 20(a).

- The California Energy Commission "uses SEP funds to pay for staff who are directly responsible for updating and maintaining California's Building Energy Efficiency Standards and Appliance Efficiency Standards, which are essential for reducing energy costs while ensuring a safe, resilient, and reliable energy supply for Californians." Martin-Gallardo-CA Decl. ¶ 13. With the Policy Flash, California "would be required to find alternate funding sources to pay the costs of employing the staff working on SEP tasks, limiting [California's] ability to use those funds in

Page 15 – PLAINTIFF STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT

support of non-federally funded programs" and will be forced to find alternative funding for its programs aimed at improving the energy and water efficiency of appliances sold to California consumers and businesses. Martin-Gallardo-CA Decl. ¶¶ 21–22.

- The Connecticut Department of Energy and Environmental Protection uses SEP funds to, among other things, "support[] municipal capabilities to save energy through water conservation and materials management/recycling." DeNicola-CT Decl. ¶ 17. The Policy Flash will negatively affect Connecticut's flexibility to reallocate funds over the course of the current program year to respond to budget deviations. *Id.* ¶ 22.

- The Colorado Energy Office uses SEP funds to fund some portion of salaries for staff working on "ongoing policy support and technical assistance on state energy issues," "regional energy investment opportunities for advanced energy technologies," and energy planning. Gomez-CO Decl. ¶ 10. The Policy Flash "will have deeply damaging effects on [Colorado's] ability to support energy security, lower energy costs, reduce greenhouse gas pollution and enable a state-wide transition to clean energy." *Id.* ¶ 25.

- The North Carolina State Energy Office relies on SEP funds to support twelve of its seventeen permanent full-time staff. Woosley-NC Decl. ¶ 24. Imposition of the Policy Flash could necessitate the elimination of six permanent staff positions. The loss of this staff would have a significant impact on the Office's ability to continue operations and effectively serve the people of North Carolina. *Id.*

- To comply with the Policy Flash, Maryland had to "fundamentally alter[] its SEP grant application from covering salaries of key programmatic staff working on the design and implementation of State Strategic Energy Investment Fund[-]funded programs to instead cover the completion of two energy-related studies," thereby impacting the effective administration of those and other programs. Pinsky-MD Decl. ¶ 20.

But the harms the Plaintiff States will suffer are not limited to the SEP. The Policy Flash applies broadly to *all* DOE programs, and DOE has confirmed it applies to additional programs, such as the WAP. Gomez-CO Decl. ¶ 30(a) & Ex. 9. Many of Plaintiff States' other energy and climate programs will be impacted by the Policy Flash. For example:

- Oregon receives funding from DOE to assist with the cleanup and remediation of risks at the Hanford Nuclear Site. The Policy Flash would reduce funds available for those efforts, severely limiting Oregon's ability to protect its residents from radioactive and nuclear waste at the Site. Benner-OR Decl. ¶¶ 18–20.

Page 16 – PLAINTIFF STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT

- The Colorado Energy Office relies on the negotiated provisional indirect cost rate to support the WAP and previously anticipated that at least $1,400,000 of the State's overall grant for fiscal year 2026 would cover indirect costs and fringe benefits. Gomez-CO Decl. ¶ 30. In total, over the last three years the Colorado Energy Office was awarded more than $259 million in federal financial assistance from DOE. *Id.* ¶ 29.

- The Connecticut Department of Energy and Environmental Protection's WAP is put at risk by the Policy Flash. DeNicola-CT Decl. ¶ 24.

- The Oregon Housing and Community Services Department and its subgrantees will also face reduced service capacity, staff reductions, and diminished program oversight for its WAP under the Policy Flash. Divan-OR Decl. ¶¶ 14, 16.

- The Illinois Environmental Protection Agency will be forced to end its long-standing Public Water Infrastructure Energy Efficiency Assessments program, and Illinois' state energy program as a whole will be endangered by the Policy Flash, which will weaken Illinois' ability to maintain sufficient staff within its Office of Energy. Poeschel-IL Decl. ¶ 26.

In sum, Plaintiff States have already begun to experience the damaging effects of the Policy Flash and will suffer additional significant and wide-ranging harms unless the policy is enjoined or set aside.

## ARGUMENT

Plaintiff States are entitled to summary judgment on their claim that the Policy Flash is contrary to law under the APA and should be enjoined and vacated. In non-APA cases, summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "When reviewing the merits under the APA, however, the Court does not ask whether there is a genuine dispute of any material fact"; rather, the standards of review are prescribed by the APA itself. *See Or. Nat. Desert Ass'n v. Bushue*, 644 F. Supp. 3d 813, 822 (D. Or. 2022). Section 706 of the APA directs that "[t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability

Page 17 – PLAINTIFF STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT

of the terms of an agency action." 5 U.S.C. § 706. Courts must "hold unlawful and set aside agency

action, findings, and conclusions found to be . . . not in accordance with law." § 706(2)(A); *see*

*also* E. Bay Sanctuary Covenant v. Biden, 993 F.3d 640, 679–81 (9th Cir. 2021) (injunction and

vacatur are both appropriate remedies for APA violations).

## I.    The Court Has Jurisdiction Over This Action.

Plaintiff States have standing and their claims are ripe as the Policy Flash has had

immediate, definite, and concrete effects on Plaintiff States. Plaintiffs' declarations show that the

Policy Flash is currently being applied to them.[7] Ass'n of Irritated Residents v. U.S. Env't Prot.

Agency, 10 F.4th 937, 943–44 (9th Cir. 2021). In particular, DOE has already applied the Policy

Flash to Plaintiff States' SEP applications that were pending at the time the Policy Flash was

issued, causing immediate damage to the programs funded by the SEP.  *See, e.g.*, McDonald-MI

Decl. ¶¶ 8–9, 12, 22; Poeschel-IL Decl. ¶¶ 7–8, 20, 23-24; Nguyen-WA Decl. ¶¶ 17, 23–24; Martin-

Gallardo-CA Decl. ¶¶ 13, 17, 22; Swan-DE Decl. ¶¶ 14, 21; DeNicola-CT Decl. ¶¶ 17, 22; Gomez-

CO Decl. ¶¶ 16–17, 21; Pawlisch-MN Decl. ¶¶ 18–20; Poisson-NY Decl. ¶ 20; Pinsky-MD Decl.

¶ 20; Benner-OR Decl. ¶¶ 22–23; Althoff-PA Decl ¶¶ 33–34.

Additionally, the Government has argued previously in indirect costs cases that the Tucker

Act applies, but it has not succeeded. The Tucker Act does not deprive this Court of jurisdiction

over this case because Plaintiffs do not seek money damages and their claims are not based in

contract. *See* Or. Council for Hums. v. U.S. DOGE Serv., No. 3:25-cv-829-SI, 2025 WL 2237478,

---

[7] *See, e.g.*, Poeschel-IL Decl. ¶¶ 13–14; Martin-Gallardo-CA Decl. ¶ 7; Swan-DE Decl. ¶ 8; Nguyen-WA Decl. ¶ 11; DeNicola-CT Decl. ¶ 12; Poisson-NY Decl. ¶ 8. Each State need not prove these effects, as "the presence of one party with standing is sufficient." Loffman v. Cal. Dep't of Educ., 119 F.4th 1147, 1164 (9th Cir. 2024) (quotation omitted).

Page 18 – PLAINTIFF STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT

at \*20–23 (D. Or. Aug. 6, 2025). To the contrary, Plaintiffs challenge DOE's policy, which caps indirect and fringe benefits costs across *all* state and local awards in direct violation of the regulatory scheme governing such awards. The Court should, accordingly, reject any jurisdictional arguments DOE raises regarding the Tucker Act, as other courts have done. *See* Nat'l Insts. of Health, 770 F. Supp. 3d at 291; AAU v. Dep't of Energy, 2025 WL 1414135, at \*5.[8]

## II.    The Policy Flash is Contrary to Law in Violation of the APA

### A.  The Policy Flash is Subject to Review Under the APA.

The Policy Flash is a "final agency action" subject to review under the APA, 5 U.S.C. § 704, because it: (1) "mark[ed] the consummation" of agency decision-making, and (2) determined "rights or obligations . . . from which legal consequences will flow." Bennett v. Spear, 520 U.S. 154, 177–78 (1997) (cleaned up); *see also* Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt., No. 25-cv-1237 (DLC), 2025 WL 1621714, at \*31 (S.D.N.Y. June 9, 2025). In determining whether an agency action is final, courts consider "factors such as whether the action amounts to a definitive statement of the agency's position, whether it has a direct and immediate effect on the day-to-day operations of the subject party, and if immediate compliance . . . is expected." Prutehi Litekyan: Save Ritidian v. U.S. Dep't of the Airforce, 128 F.4th 1089, 1109 (9th Cir. 2025) (quoting Nat'l Lab. Rels. Bd. v. Siren Retail Corp., 99 F.4th 1118, 1123 (9th Cir. 2024)). Finality is "interpreted in a pragmatic and flexible manner," "focus[ing] on the practical and legal effects of

---

[8] The Supreme Court's recent partial stay decision in National Institutes of Health v. American Public Health Association, No. 25A103 (Aug. 21, 2025), further confirms that district courts may properly exercise jurisdiction to review agencies' categorical grant-related policies under the APA. *See* Slip Op. at 1.

Page 19 – PLAINTIFF STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT

the agency action." *Saliba v. U.S. Sec. & Exch. Comm'n*, 47 F.4th 961, 967 (9th Cir. 2022) (quoting *Or. Nat. Res. Council v. Harrell*, 52 F.3d 1499, 1504 (9th Cir. 1995)).

The Policy Flash by its plain language applied with immediate effect to all new and conditional DOE grants as of May 8, 2025, when it was issued. *See* Ex. 1 at 2–3. There is nothing "tentative or interlocutory" about that determination. To the contrary, DOE has already implemented the Policy via the FAL, and the Policy's implementation has resulted in concrete legal consequences for SEP grantees, whose submissions were returned for failure to comply with the 10% cap. *See, e.g.*, Poeschel-IL Decl. ¶¶ 13–14; Martin-Gallardo-CA Decl. ¶ 7; Swan-DE Decl. ¶ 8; Nguyen-WA Decl. ¶ 11; DeNicola-CT Decl. ¶ 12; Poisson-NY Decl. ¶ 8; Goodman-KY Decl. ¶¶ 8–9; Schwing-HI Decl. ¶ 8; Pinsky-MD Decl. ¶¶ 10–12; Benner-OR Decl. ¶¶ 8–10. And in response to many States' inquiries about the Policy Flash's application to SEP grants, DOE could not have been clearer: "there will be no changes to the Indirect Rate policy flashes." Poisson-NY Decl. ¶ 10 (quoting DOE August 4, 2025 email).

## B.  It is Contrary to Law for an Agency to Violate Its Own Regulations

The Policy Flash violates federal regulations, adopted by DOE, that govern reimbursement of indirect costs and fringe benefits and is therefore contrary to law under the APA. "The [APA] requires federal courts to set aside federal agency action that is 'not in accordance with law[]' . . . which means, of course, *any* law." *See FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003) (quoting 5 U.S.C. § 706(2)(A)). This includes an agency's own rules. *See Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 852 (9th Cir. 2003). Agency action is thus "contrary to law" if it "disregard[s]" the agency's "own regulations and policies." *Doe v. Noem*, 778 F. Supp. 3d 1151, 1160 (W.D. Wash. 2025); *see also Victim Rts. L. Ctr. v. U.S. Dep't of Educ.*, No. 25-11042-MJJ, 2025 WL 1704311, at *15 (D. Mass. June 18, 2025).

Page 20 – PLAINTIFF STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT

The Policy Flash does not attempt to address—let alone comply with—the extensive regulatory infrastructure governing cost reimbursement and setting forth the negotiation process that results in federal approval of the indirect cost rate for each State agency. *See supra* Background Part II. As set forth below, the Policy Flash and its implementation contravene several regulations, and each violation is an independent basis for concluding that the Policy Flash is contrary to law and should be vacated or enjoined.

### C. The Policy Flash and its Implementation Violate Several Provisions of 2 C.F.R. § 200.414

#### 1. 2 C.F.R. § 200.414(c)(1) and (3)

DOE, like all federal agencies, must "accept[]" State agencies' negotiated indirect cost rates, unless one of two very narrow exceptions applies. 2 C.F.R. § 200.414(c)(1). The Policy Flash is contrary to law because it violates this requirement without making any attempt to satisfy either exception. The Policy Flash forces States to seek reimbursement for smaller amounts of indirect costs (now mixed with fringe costs) than the reimbursement amount to which they are entitled through a straightforward application of their negotiated rate. Four other federal courts have already concluded that similar categorical caps on indirect costs are contrary to law. This Court should do the same.

In a flimsy attempt to circumvent these decisions, DOE frames the Policy Flash as a *cost* cap, in contrast to the *rate* cap at issue in the other enjoined policies. *See* Fact Sheet, Ex. 4 at 1, 3. On that basis, DOE claims that State agencies "should continue to utilize their negotiated and approved indirect cost rate(s) in applications for Awards" notwithstanding that DOE "will establish a maximum dollar amount that it will reimburse under Awards to state and local governments." Policy Flash, Ex. 1 at 4; *see also* Fact Sheet, Ex. 4 at 3 (States "shall utilize" the negotiated rate). This claim is flawed for multiple reasons.

Page 21 – PLAINTIFF STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT

To start, States will clearly *not* be able to "utilize" their negotiated indirect cost rates because the Policy Flash forces States to artificially lower their indirect cost reimbursement regardless of their actual allowable and allocable costs. However it is characterized, DOE is using the cap to evade the regulations that govern cost recovery under federal awards. Due to the Policy Flash, States will receive lower reimbursement for indirect costs than they should under States' negotiated rates that DOE is bound to follow.

DOE's guidance leaves no room for doubt—States must use the capped amount, not their indirect cost rates, in submitting applications. Fact Sheet, Ex. 4 at 3 (States will need to "determine how to adjust their budget[s] to ensure the cap is not exceeded."). And DOE will not accept an agency's negotiated indirect cost rate if it exceeds the cap. FAL, Ex. 2 at 6 (if a State agency's negotiated "rate yields higher indirect cost amounts than the" Policy Flash's "limitation allows, the limited amount must be used."); *see also* Fact Sheet, Ex. 4 at 3 ("[I]f the dollar amount of indirect costs under the approved rates exceeds the cap amount, the amount more than the cap is not allowed."). That is precisely what happened when States submitted their SEP budgets that were complaint with their indirect cost rates: DOE rejected them as noncompliant with the Policy Flash. *See supra* Background Part IV.

Nor can DOE invoke the exceptions in 2 C.F.R. § 200.414(c)(1) or (c)(3), which allow for deviation from negotiated indirect cost rates in narrow circumstances. Perhaps in recognition that recent decisions have uniformly rejected agencies' (including DOE's) invocation of the (c)(3) regulatory exception, the Policy Flash does not even purport to rely on it.[9] But even if DOE did

---

[9] DOE knows how to invoke this exception when it wants to. The now-vacated DOE policy as to institutions of higher education specifically states that it was issued under the 2 C.F.R.

Attorney General for the State of New York
28 Liberty St.
New York, NY 10005
(929) 638-0047

claim an exception here, its claim would fail for the same reason other courts have recognized: a policy applying an indirect cost cap to all awards in perpetuity cannot be squared with the exceptions' narrow scope.

Specifically, under 2 C.F.R. § 200.414(c)(1), "[a] Federal agency may use a rate different from the negotiated rate for either a class of Federal awards or a single Federal award only when required by Federal statute or regulation, or when approved by the awarding Federal agency in accordance with paragraph (c)(3) of this section." And under 2 C.F.R. § 200.414(c)(3), "[a] Federal agency must implement, and make publicly available, the policies, procedures and general decision-making criteria that their programs will follow to seek and justify deviations from negotiated rates."

Neither exception applies here. No federal statute or regulation permits (let alone requires) DOE to jettison states agencies' negotiated rates, a requirement for the (c)(1) exemption. *Cf.* 2 C.F.R. § 200.414(c)(1). Nor can DOE claim that Policy Flash is a proper "deviation" from State agencies' negotiated indirect cost rate under 2 C.F.R. § 200.414(c)(3). First, the Policy Flash's 10% across-the-board cap is not a deviation "if the word 'deviation' is given its ordinary meaning." *Nat'l Sci. Found.*, 2025 WL 1725857, at *14. Deviation means to stray from the norm, but the Policy Flash "eliminates the existing norm." *Id.*

Second, 2 C.F.R. § 200.414(c)(3) "contemplates a step-by-step process for a change to a negotiated indirect cost rate, rather than a one fell swoop approach invalidating all pre-existing

_____

§ 200.414(c)(3) exception. *PF 2025-22: Adjusting Dep't of Energy's Grant Policy for Institutions of Higher Education (IHE)*, U.S. Dep't of Energy (Apr. 11, 2025), *available at* https://www.energy.gov/management/pf-2025-22-pf-2025-22-adjusting-department-energy-grant-policy-institutions-higher. (vacated by final judgment in *AAU v. Dep't of Energy*, No. 25-cv-10912-ADB (D. Mass. 2025), Dkt. No. 71).

Page 23 – PLAINTIFF STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT

NICRAs and changing the well-established procedure for all future grants." *AAU v. Dep't of Energy*, 2025 WL 1414135, at *15. An agency seeking to deviate from the NICRA must identify and justify the deviation *before* applying it. *See id.*; *see also* *Nat'l Insts. of Health*, 770 F. Supp. 3d at 298. DOE must make "publicly available, the policies, procedures and general decision-making criteria that their programs will follow to seek and justify deviations from negotiated rates," 2 C.F.R. § 200.414(c)(3). "To read the provision to permit the DOE to make the . . . rate cap policy public at the same time as it seeks to enforce it would read these verb tenses, as well as the requirement that the DOE 'justify' the deviation, out of the provision." *AAU v. Dep't of Energy, 2025* WL 1414135, at *15. Here, DOE failed to set forth the policies, procedures, or general decision-making criteria for any purported deviation since DOE set, in one fell swoop, a blanket rate applicable to all State and local applicants for DOE grants indefinitely.

Third, the Policy Flash does not apply only to "a class of Federal awards or a single Federal award," as the regulation requires. *See* 2 C.F.R. § 200.414(c)(1). Under 2 C.F.R. § 200.1, a "Class of Federal awards means a group of Federal awards either awarded under a specific program or group of programs or to a specific type of recipient or group of recipients to which specific provisions or exceptions may apply." But there are no "specific provisions or exceptions" that apply to every state and local government. Interpreting the term "class" to encompass every single DOE grant awarded to any state or local government at any future point in time "would allow the exception to swallow the whole." *Nat'l Sci. Found.*, 2025 WL 1725857, at *14.

Fourth, as noted in *AAU v. Department of Energy*, invoking the exception requires some meaningful explanation, as the (c)(3) exception "clearly contemplates that agency approval of a departure from a negotiated rate must be based on the careful consideration of a strong underlying rationale that warrants the change." *AAU v. Dep't of Energy*, 2025 WL 1414135, at *14 (citing

Page 24 – PLAINTIFF STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT

Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 78 Fed. Reg. 78,590, 78,600 (Dec. 26, 2013)). The explanation for the Policy Flash here plainly falls short, as the Policy Flash fails to explain why indirect costs and fringe benefits that were negotiated on the basis of documented evidence are now inappropriate or what efficiency would be served.

Finally, the Policy Flash is at odds with the purpose of 2 C.F.R. § 200.414, which is to reimburse actual, documented indirect costs. Plaintiffs submitted extensive documentation in the course of negotiating their NICRAs, and federal agencies—in some instances, *DOE itself*, *see*, *e.g.*, Poisson-NY Decl. ¶ 10—agreed to their indirect cost rates (typically ranging from approximately 15% to 45%) based on that documentation. *See supra* Background Part II.C. The Policy Flash replaces that rate based on no documentation or evidence at all.

### 2. 2 C.F.R. § 200.414(c)(4)

The Policy Flash is also contrary to 2 C.F.R. § 200.414(c)(4) for awards that DOE terms "conditional" awards (that is, "awards for prior Notices of Funding Opportunity or Funding Opportunity Announcements where negotiations are not yet complete and/or the Award has not been executed," Ex. 1 at 3). The Policy Flash purports to change the indirect cost rate after notices of funding opportunity were issued and also *after* states applied for their SEP awards in reliance on their negotiated NICRA. *See AAU v. Dep't of Energy*, 2025 WL 1414135, at *15. The Policy Flash thus violates 2 C.F.R. § 200.414(c)(4).

### 3. 2 C.F.R. § 200.414(d)

The Policy Flash also violates 2 C.F.R. § 200.414(d), because it requires State agencies to cap their subrecipients' indirect and fringe costs instead of applying their subrecipients' indirect cost rates. State agencies, as "pass-through entities," are required to "accept all federally negotiated

Page 25 – PLAINTIFF STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT

indirect costs rates for subrecipients." 2 C.F.R. § 200.414(d). A "pass-through entity" is a recipient "that provides a subaward to a subrecipient . . . to carry out part of a Federal program." *Id.* § 200.1. The FAL makes clear that the reimbursement cap applies to subrecipients, and that "[t]he maximum amount of funds to be paid or reimbursed from the recipient to a subrecipient for its indirect costs and fringe benefits under a subaward will be calculated as a percentage (%) of the total subaward amount" depending on the type of organization or entity. FAL, Ex. 2 at 6, 8–9. For for-profit and nonprofit organizations, the maximum reimbursement amount is 15% of the total award amount, and for state and local governments, the maximum reimbursement amount is 10% of the total award amount. FAL, Ex. 2 at 9. Thus, in the same way that the Policy Flash precludes DOE from "accept[ing]" State agencies' negotiated indirect cost rate in violation of 2 C.F.R. § 200.414(c)(1), the Policy Flash prohibits the State agencies from "accept[ing]" their subrecipients' negotiated indirect cost rates, as they are required to do under 2 C.F.R. § 200.414(d).

### 4. 2 C.F.R. § 200.414(f)

Finally, 2 C.F.R. § 200.414(f), which sets a 15 percent "de minimis" indirect cost rate where there is no NICRA is in place, further highlights why the Policy Flash's 10% cap is contrary to the regulatory scheme. Indeed, subsection (f) clearly establishes that grant recipients are not required to use the de minimis rate:

> Recipients and subrecipients that do not have a current Federal negotiated indirect cost rate (including provisional rate) may elect to charge a de minimis rate of up to 15 percent of modified total direct costs (MTDC). The recipient or subrecipient is authorized to determine the appropriate rate up to this limit. Federal agencies and pass-through entities may not require recipients and subrecipients to use a de minimis rate lower than the negotiated indirect cost rate or the rate elected pursuant to this subsection unless required by Federal statute or regulation.

2 C.F.R. § 200.414(f). That subsection would be meaningless if federal agencies were technically prohibited from imposing a de minimis rate but nevertheless free to unilaterally impose an indirect

Page 26 – PLAINTIFF STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT

cost cap of 10% of the total award that would result in an indirect cost rate that is even lower than the 15% de minimis rate. *See Dep't of Def.*, 2025 WL 2022628, at *17; *see also* Fontaine-WI Decl. ¶¶ 16–17 (showing how the Policy Flash reduces reimbursement below a 15% indirect cost rate).

**D. The Policy Flash Unlawfully Limits Fringe Benefits, in Violation of the Regulatory Scheme for Determining Allowable Fringe Costs**

The Policy Flash introduces a new wrinkle, not seen in the previous four indirect cost policies struck down by courts: it limits not only indirect costs, but the sum of indirect costs and fringe benefits. This limitation on fringe benefits is independently unlawful under the regulatory scheme for calculating allowable fringe costs.

The Policy Flash lumps all fringe costs in with indirect costs even though "[t]here is no universal rule for classifying certain costs as direct or indirect costs." 2 C.F.R. § 200.412. "[A] cost's being treated as direct or indirect is a function of accounting and of the principles set forth in [the regulatory framework]." *Dep't of Def.*, 2025 WL 2022628, at *3. Regulations provide that some fringe costs can be charged as direct or indirect costs depending on whether such costs are attributable to specific employees supported by a specific award (direct costs) or support employees working on projects across multiple awards (indirect costs). 2 C.F.R. §§ 200.413-414. For example, 2 C.F.R. § 200.413(b) makes clear that direct costs include fringe costs that can be attributable to a specific project supported by DOE funding, such as "the proportion of employee compensation and fringe benefits expended in relation to that specific award." *Id.* § 200.413(a)– (b) (emphasis added); *see also id.* § 200.431(c) (some fringe calculated as direct or indirect based on "the recipient's or subrecipient's accounting practices").

The Policy Flash is contrary to how direct and indirect costs are classified under the regulatory scheme by forcing States to include all fringe costs in the indirect cost cap. There is no legal basis for DOE to characterize all fringe costs as indirect costs. To the contrary, while *indirect*

Page 27 – PLAINTIFF STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT

fringe costs are charged back to federal grants using indirect cost rates, *supra* Background Part II and 2 C.F.R. pt. 200 App'x VII ¶ F(1) (providing that fringe benefit rates must be included in the indirect cost negotiation process), *direct* fringe costs are not subject to this rate-setting framework. Indeed, many States treat fringe costs as direct costs. For example, both Colorado and Minnesota have rate agreements with their cognizant agencies, which specify that "fringe benefits are specifically identified to each employee and are charged individually as direct costs." Gomez-CO Decl. ¶ 18 & Ex 8 at 2; Pawlisch-MN Decl. ¶ 17 & Ex. 1 at 2. By combining fringe costs with indirect costs, the Policy Flash ignores regulations directing DOE how to apply fringe as direct or indirect costs, 2 C.F.R. §§ 200.411–414.

There is likewise no legal basis for DOE to categorically cap the sum of indirect and fringe costs at 10% of the total award. Direct fringe costs are reimbursable as long as they are "allowable," 2 C.F.R. § 200.403, and meet the requirements set forth in 2 C.F.R. § 200.431, the subpart which specifically addresses fringe costs. *See Id*. § 200.420(b). Fringe benefits must also be "reasonable" and required by law, contract, or an established policy of the recipient or subrecipient. *Id*. § 200.431(a). Thus, under this regulatory framework, as long as the direct fringe costs are allowable, reasonable, and required by law, contract, or an established policy, such costs are included in the total cost of the award and must be paid. *Id*. § 200.402. Here, DOE has neither contested the validity of these costs nor determined that the States' fringe costs are unallowable, unreasonable, or not required by law, contract, or an established policy. Nor could it do so in such a sweeping fashion without any individualized analysis under the relevant factors. The regulatory scheme "provides no clever workaround for agencies to disallow already allowed costs." *Dep't of Def.*, 2025 WL 2022628, at *17. Thus, the Policy Flash upends this reticulated scheme, providing

Page 28 – PLAINTIFF STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT

a categorical cap on fringe that contravenes the established standards for determining whether and how such costs are reimbursable.

### E. The Policy Flash Violates the Basic Principle that All Federal Awards Are Comprised of the Sum of Allowable and Allocable Costs, Effectively Imposing Unlawful Cost Sharing

Finally, the Policy Flash is contrary to the basic principle of the federal award system: "The total cost of a Federal award is the sum of the allowable direct and allocable indirect costs, less any applicable credits." 2 C.F.R. § 200.402. A federal agency pays the full cost of the award—that is, the sum of allowable direct and allocable indirect costs—except under the limited circumstances when cost sharing is allowed. *Id*. § 200.306. The Policy Flash sets a "maximum dollar amount that it will reimburse under Awards to state and local governments." Policy Flash, Ex. 1 at 4. By doing so, it unlawfully excludes otherwise allowable and allocable indirect costs and fringe benefit costs.

The effect of DOE's cap is thus to functionally impose cost sharing—i.e., requiring States to fund a portion of project costs—without complying with the regulations for doing so. For cost sharing to be lawful, it must be identified not only in the notice of funding opportunity, but also the actual award, and be subject to accounting and audit requirements. 2 C.F.R. §§ 200.414(c)(4); *id.* § 200.211(b)(9); *id.* § 200.306. Indeed, federal regulations provide a "clear presumption against (and specific procedures in the case of) mandatory cost sharing." *Dep't of Def.*, 2025 WL 2022628, at *6. DOE did not meet, and did not purport to meet, any of these requirements. The SEP Program, where DOE has begun to implement the Policy Flash, specifically *does not* require cost sharing. DOE Operations Manual at 9.

For example, if the cap was imposed on the hypothetical $120,000 award described in the Complaint, Dkt. No. 1 ¶ 132, which is comprised of $80,000 in direct costs (including $16,000 in fringe costs and $64,000 in other direct costs) and $40,000 in indirect costs, DOE now—under the

Page 29 – PLAINTIFF STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT

Policy Flash—would cover only 59% of the total costs of the project ($71,111.11 of the previously $120,0000 award), and the State would have to pick up the remaining 41%.[10] In sum, the Policy Flash "uses an improper tool"—here, a cap on indirect and fringe costs—"to accomplish an impermissible goal (implicit cost sharing)." *Dep't of Def.*, 2025 WL 2022628, at *15; *see also Nat'l Sci. Found.*, 2025 WL 1725857, at *12 ("In limiting the portion of . . . indirect costs that NSF will reimburse, the [] Indirect Cost Rate imposes indirect cost sharing on the institution."). As one court remarked, "the cost sharing rules would have little meaning or effect if they could be worked around so easily to achieve cost sharing by another name." *Dep't of Def.*, 2025 WL 2022628, at *6.

## CONCLUSION

For the foregoing reasons, Plaintiff States respectfully request that the Court grant their motion for summary judgment on Count I of the Complaint and enter an order pursuant to 5 U.S.C. § 706(2) holding unlawful and vacating the Policy Flash; enter a declaratory judgment finding that the Policy Flash is contrary to law; and issue permanent injunctive relief barring implementation

---

[10] The fundamental incoherence of the Policy Flash makes it complicated to give a concrete example, but the math here is as follows: In our hypothetical, Plaintiff States assume that the federal government would have reimbursed the full $120,000 prior to the Policy Flash. But the Policy Flash's 10% cap would limit the total amount of reimbursable indirect and fringe costs of this same award to $12,000. $64,000 in non-fringe direct costs and $12,000 in indirect costs/fringe would lead to a total award of only $76,000. But there's a problem! The $12,000 now exceeds 10% of the total award, which requires the sum of indirect costs and fringe to be no more than $7,600 on the $76,000 award. Redoing the calculation using this new cap amount, $7,600, would make the total award $73,600 ($64,000 plus $7,600). But then—again—the $7,600 would exceed 10% of that award. And so on. Ultimately, an award with $64,000 in non-fringe direct costs could have a maximum of $7,111.11 in indirect costs and fringe, for a total award of $71,111.11 comprised of 90% direct costs and 10% fringe and indirect costs. Getting back to cost share, the federal government would now be paying only $71,111.11 of what was previously a $120,000 award: that is, the federal government would pay only 59% of what it previously did, and require the State to pay the remaining 41%. That is, effectively, cost sharing.

Page 30 – PLAINTIFF STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT

of the Policy Flash in Plaintiff States,[11] including through the FAL, June 30 Letter, Fact Sheet, and

any communications requiring Plaintiff States to comply with the Policy Flash; and award such

other relief as this Court may deem just and proper.

Dated: August 27, 2025

Respectfully submitted,

**LETITIA JAMES**
Attorney General for the State of New York

By: */s/ Rabia Muqaddam*
Rabia Muqaddam
*Chief Counsel for Federal Initiatives*
Jessica Ranucci
*Special Counsel*
28 Liberty St.
New York, NY 10005
(929) 638-0447
rabia.muqaddam@ag.ny.gov
jessica.ranucci@ag.ny.gov

*Attorneys for the State of New York*

**DAN RAYFIELD**
Attorney General for the State of Oregon

By: */s/ Brian Simmonds Marshall*
Brian Simmonds Marshall #196129
Leanne Hartmann #T25070201, Mass. Bbo #
667852
*Senior Assistant Attorneys General*
Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Brian.S.Marshall@doj.oregon.gov
Leanne.Hartmann@doj.oregon.gov

*Attorneys for the State of Oregon*

**KEITH ELLISON**
Attorney General for the State of Minnesota

By: */s/ Katherine Bies*
Katherine Bies
*Assistant Attorney General*
Minnesota Attorney General's Office
445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
(651) 300-0917
Katherine.Bies@ag.state.mn.us

*Attorney for the State of Minnesota*

**PHILIP J. WEISER**
Attorney General for the State of Colorado

By: /s/ *Carrie Noteboom*
Carrie Noteboom
*Assistant Deputy Attorney General*
Jessica L. Lowrey
*First Assistant Attorney General*
Phalen Kohlruss-Reuman
*Assistant Attorney General*
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, CO  80203

---

[11] Plaintiff States include relevant subdivisions and instrumentalities.

Page 31 – PLAINTIFF STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT

(720) 508-6000
carrie.noteboom@coag.gov
jessica.lowrey@coag.gov
phalen.kohlruss@coag.gov
FAX: (720) 508-6040

*Attorneys for the State of Colorado*

**WILLIAM TONG**
Attorney General of Connecticut

By: */s/ Jill Lacedonia*
Jill Lacedonia
*Assistant Attorney General*
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5250
Jill.Lacedonia@ct.gov

*Attorney for the State of Connecticut*

**ROB BONTA**
Attorney General for the State of California

By: */s/ Theodore McCombs*
Theodore McCombs
Marie Logan
*Deputy Attorneys General*
California Attorney General's Office
600 W. Broadway, Suite 1800
San Diego, CA 92101
(619) 738-9003
Theodore.McCombs@doj.ca.gov
Marie.Logan@doj.ca.gov

*Attorneys for the State of California*

**BRIAN L. SCHWALB**
Attorney General for the District of
Columbia

By: */s/ Lauren M. Marks*
Lauren M. Marks*
*Special Assistant Attorney General*
Office of the Attorney General for the
District of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 256-3713
Lauren.Marks@dc.gov

*Admitted only in Michigan; practice
supervised by D.C. Bar Members*

*Attorney for the District of Columbia*

**KATHLEEN JENNINGS**
Attorney General for the State of Delaware

By: */s/ Vanessa L. Kassab*
Ian R. Liston
*Director Of Impact Litigation*
Vanessa L. Kassab
*Deputy Attorney General*
Rose E. Gibson
*Assistant Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Attorneys for the State of Delaware*

**KWAME RAOUL**
Attorney General for the State of Illinois

**ANNE E. LOPEZ**
Attorney General for the State of Hawai'i

Page 32 – PLAINTIFF STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT

By: */s/ Elena S. Meth*
Cara Hendrickson
*Executive Deputy Attorney General*
Elena S. Meth
*Assistant Attorney General*
Office of the Illinois Attorney General
115 S. LaSalle St.
Chicago, IL 60603
(773) 835-0182
Cara.Hendrickson@ilag.gov
Elena.Meth@ilag.gov

*Attorneys for the State of Illinois*

**AARON M. FREY**
Attorney General for the State of Maine

By: */s/ Caleb Elwell*
Caleb E. Elwell
*Assistant Attorney General*
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333
(207) 626-8545
Caleb.elwell@maine.gov

*Attorney for the State of Maine*

**AARON D. FORD**
Attorney General for the State of Nevada

By: */s/ Heidi Parry Stern*
Heidi Parry Stern (Bar. No. 8873)
*Solicitor General*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119

By: */s/ Kalikoʻonālani D. Fernandes*
David D. Day
*Special Assistant to the Attorney General*
Kalikoʻonālani D. Fernandes
*Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov

*Attorneys for the State of Hawaiʻi*

**OFFICE OF THE GOVERNOR ex rel.
Andy Beshear, in his official capacity as
Governor of the Commonwealth of
Kentucky**

By: */s/ S. Travis Mayo*
S. Travis Mayo
*General Counsel*
Taylor Payne
*Chief Deputy General Counsel*
Laura C. Tipton
*Deputy General Counsel*
Office of the Governor
700 Capitol Avenue, Suite 106
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov

*Attorneys for Office of The Governor* ex rel.
*Andy Beshear*

**ANTHONY G. BROWN**
Attorney General for the State of Maryland

By: */s/ Robert N. Brewer*
Robert N. Brewer
*Assistant Attorney General*
Maryland Office of the Attorney General
Federal Accountability Unit
200 Saint Paul Place

Page 33 – PLAINTIFF STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT

HStern@ag.nv.gov

*Attorney for the State of Nevada*


**RAÚL TORREZ**
Attorney General for the State of New Mexico

By: */s/ Mark Noferi*
Mark Noferi
*Senior Litigation Counsel*
NM Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
(505) 490-4060
MNoferi@nmdoj.gov


*Attorney for the State of New Mexico*


**JOSH SHAPIRO in his official capacity as Governor of the Commonwealth of Pennsylvania**

By: */s/ Jacob B. Boyer*
Jennifer Selber
*General Counsel*
Jacob B. Boyer
*Deputy General Counsel*
Pennsylvania Office of the Governor
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(717) 460-6786
jacobboyer@pa.gov


*Attorneys for Governor Josh Shapiro*


**JOSHUA L. KAUL**
Attorney General for the State of Wisconsin

By: */s/ Aaron J. Bibb*
Aaron J. Bibb, Wisconsin State Bar No. 1104662
*Assistant Attorney General*

Baltimore, MD 21202
(410) 576-6924
rbrewer@oag.state.md.us

*Attorney for the State of Maryland*


**DANA NESSEL**
Attorney General of Michigan

By: */s/ Neil Giovanatti*
Neil Giovanatti
Polly Synk
*Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
SynkP@michigan.gov

*Attorneys for the State of Michigan*


**JEFF JACKSON**
Attorney General of North Carolina

By */s/ Daniel P. Mosteller*
Laura Howard
*Chief Deputy Attorney General*
Daniel P. Mosteller
*Associate Deputy Attorney General*
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
919-716-6026
dmosteller@ncdoj.gov

*Attorneys for the State of North Carolina*


**NICHOLAS W. BROWN**
Attorney General for the State of Washington

By: */s/ Kate S. Worthington*
Kate S. Worthington, WSBA No. 47556
*Assistant Attorney General*
7141 Cleanwater Drive SW

Page 34 – PLAINTIFF STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT

Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
(608) 266-0810
aaron.bibb@wisdoj.gov

*Attorney for the State of Wisconsin*

P.O. Box 40111
Olympia, WA 98504-0111
(306) 709-6470
kate.worthington@atg.wa.gov

*Attorney for the State of Washington*

Page 35 – PLAINTIFF STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT

## CERTIFICATE OF SERVICE

I certify that on August 27, 2025, I served the foregoing upon the parties hereto by the method indicated below, and addressed to the following:

| | |
|---|---|
| I-Heng Hsu | ___ HAND DELIVERY |
| Michael Tye | ___ MAIL DELIVERY |
| U.S. Department of Justice | ___ OVERNIGHT MAIL |
| Commercial Litigation Branch | ___ TELECOPY (FAX) |
| | _X_ E-MAIL |
| *Counsel for Defendants* | ___ E-SERVE |

           _____/s/Rabia Muqaddam_____
           LETITIA JAMES
           Attorney General for the State of New York
           Rabia Muqaddam
           Chief Counsel for Federal Initiatives
           Jessica Ranucci
           Special Counsel
           28 Liberty St.
           New York, NY 10005
           (929) 638-0447
           Email:  rabia.muqaddam@ag.ny.gov
                    jessica.ranucci@ag.ny.gov

Page 36 – PLAINTIFF STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT