UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

STATE OF NEW YORK, *et al*.

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF ENERGY, *et al*.

Defendants.

Case No. 6:25-cv-01458-MTK

**OPINION AND ORDER**

**KASUBHAI,** United States District Judge:

Plaintiffs filed this lawsuit alleging that Defendants United States Department of Energy ("DOE") and Chris Wright in his official capacity as Secretary of that agency violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), by creating a new policy which Plaintiffs allege is contrary to law (Count 1) and arbitrary and capricious (Count 2). Before the Court is Plaintiffs' Motion for Partial Summary Judgment as to Count 1 of their Complaint, ECF No. 28; and Defendants' Motion to Dismiss, ECF No. 59. For the reasons below, Plaintiffs' motion is granted and Defendants' motion is denied.

## BACKGROUND

Plaintiffs are a collection of States and the District of Columbia who receive funding from DOE grants. The Office of Management and Budget ("OMB") has established—and DOE has adopted—a regulatory framework applicable to such grant awards. On May 8, 2025, Defendants issued a "Policy Flash" that Plaintiffs contend is arbitrary and capricious and contrary to the applicable regulations and therefore unlawful under the APA.

### I. DOE Funding

Plaintiffs' energy agencies receive substantial funding from DOE through various financial assistance programs. For example, under the State Energy Program ("SEP"), DOE provides financial assistance to states in developing and implementing energy conservation plans. 42 U.S.C. § 6323(b). These awards fund a vast array of activities and programs operated by Plaintiffs with the purpose to improve energy efficiency; increase the use of renewable energy and alternative fuels; reduce greenhouse gas emissions; and improve energy system security, reliability, and resilience. *See generally* Decls. in Supp. of Pls.' Mot. for Partial Summ. J., ECF Nos. 30-45, 47. DOE uses a regulatory formula to establish the amount of funding states receive upon application for SEP grant funding each year. Gerstman Decl. ¶ 5, ECF No. 57. In 2024, DOE approved a total of $60,000,000 in financial assistance awards under SEP. *Id.* ¶ 6.

DOE also provides grant awards to states through the Weatherization Assistance Program ("WAP") for state and local agencies to provide weatherization assistance to low-income persons. 42 U.S.C. § 6864(a). WAP can be used for initiatives such as energy efficiency upgrades to low-income households and energy audits. Divan Decl. ¶ 5, ECF No. 33. Additionally, WAP awardees may use awards for direct service deliveries or necessary administrative infrastructure. *Id.* ¶ 6. As with SEP, DOE uses a regulatory formula to establish the amount of funding states receive upon application for WAP grants each year. Schroeder

Decl. ¶ 4, ECF No. 58. In 2025, DOE "intends to award" $355,000,000 in WAP financial assistance awards by the end of the fiscal year. *Id*. ¶ 5

Plaintiff State of Oregon also receives DOE grant funds—totaling $9,055,910 for program years 2016-2025—for cleanup and remediation of "toxic radioactive sludge" at Hanford Nuclear Site. Benner Decl. ¶ 18-19, ECF No. 31.

Rather than receiving grant funding as a lump sum, grantees instead seek reimbursement from DOE based on actual documented costs as they are incurred or based on a need for immediate disbursement during a given period. Lavergne Decl. ¶ 5, ECF No. 56. The mechanism for that reimbursement is governed by regulation, as discussed below.

## II. Regulatory Framework

DOE has adopted the OMB Uniform Guidance governing grant management and is therefore subject to the regulations set forth in 2 C.F.R. part 200 ("the regulations"). 2 C.F.R. § 910.120. The regulations establish a framework for reimbursement of costs using grant funds.

"The total cost of a Federal award is the sum of the allowable direct and allocable indirect costs minus any applicable credits." 2 C.F.R. § 200.402. The regulations provide specific definitions for those terms. Costs are "allowable" so long as they meet certain requirements and are "allocable" if they are incurred for the award, benefit the award and other work of the recipient, and are "necessary to the overall operation of the recipient." 2 C.F.R. § 200.403, 2 C.F.R. § 200.405(a). "Direct costs" are those which are attributed to a specific project. 2 C.F.R. § 200.413 (Direct costs "can be identified specifically with a particular final cost objective" or "can be directly assigned to such activities"). By contrast, "indirect costs" are those which are "incurred for common or joint purposes." 2 C.F.R. part 200 app. VII A(1). Indirect costs are categorized as "facilities" costs that include "depreciation on buildings, equipment and capital improvements, interest on debt associated with certain buildings . . . , and operations and

maintenance expenses;" and "administration" that includes "general administration and general expenses such as the director's office, accounting, personnel, and all other types of expenditures not listed specifically under one of the subcategories of 'Facilities.'" 2 C.F.R. § 200.414.

The regulations provide a mechanism for recovery of indirect costs, specifically through the use of an "indirect cost rate." 2 C.F.R. § 200.416(b); app. VII A(3), B(7). That rate is "a device for determining in a reasonable manner the proportion of indirect costs each program should bear," and is expressed as a percentage of the indirect costs to a direct cost base. App. VII B(7). The indirect cost rate is determined through a negotiation process with the federal agency from whom states receive the largest share of their federal grant award (the "cognizant agency"). App. V F(1); app. VII (D)-(E). Under the prescribed process, state agencies submit proposed indirect cost rates along with documentation supporting those rates, including financial data. App. VII ¶ D(1)-(2). The proposed indirect cost rates are then "reviewed, negotiated, and approved by the cognizant agency," and the ultimate agreed-upon indirect cost rate is then formalized by a negotiated indirect cost rate agreement ("NICRA"). App. VII (E)(1), (3). Alternatively, states may elect—but cannot be required—to charge a "de minimis rate" of up to 15%. 2 C.F.R. § 200.414(f).

Federal agencies must "accept[]" NICRA rates, although they "may use a rate different from the negotiated rate for either a class of Federal awards or a single Federal award . . . when required by Federal statute or regulation, or when approved by the awarding Federal agency in accordance [with the regulations]". 2 C.F.R. § 200.414(c)(1). To seek such deviations, "[t]he Federal agency must implement, and make publicly available, the policies, procedures and general decision-making criteria that their programs will follow to seek and justify deviations from negotiated rates." 2 C.F.R. § 200.414(c)(3). States that provide subawards to other

recipients (in which case states act as "pass-through entities") are likewise bound by NICRA rates with respect to those subrecipients. 2 C.F.R. § 200.414(d).

The regulations also provide for the recovery of certain "fringe benefits," including insurance, leave, pensions, and unemployment benefits. 2 C.F.R. § 200.431(a). Fringe benefits are "allowable" "provided that the benefits are reasonable and are required by law, an organization-employee agreement, or an established policy of the recipient or subrecipient." *Id.* For certain types of fringe benefits such as leave, insurance, pension plan costs, and severance, specific criteria govern whether those fringe benefits are allowable. 2 C.F.R. § 200.431(b)-(i). Depending on the state's accounting practices and the general rules governing direct and indirect costs, fringe benefits may be classified as either direct or indirect costs. 2 C.F.R. § 200.431(c).

**III. Litigation Regarding Indirect Cost Rate Caps**

Since at least February 2025, several federal agencies have attempted to implement caps on indirect cost rates for other grant programs subject to the regulations discussed above. In the ensuing litigation, courts have uniformly found those "rate caps" in violation of the regulations and vacated those caps. *See, e.g.*, *Ass'n of Am. Univs. v. Dep't of Def.*, 2025 WL 2899765 (D. Mass. Oct. 10, 2025) (finding rate cap contrary to law and vacating it); *Ass'n of Am. Univs. v. Nat'l Sci. Found.*, 788 F. Supp. 3d 106 (D. Mass. 2025) (same); *Massachusetts v. Nat'l Insts. of Health*, 2025 WL 1063760 (D. Mass. Apr. 4, 2025) (same). Another court also preliminarily enjoined a rate cap policy issued by Defendant DOE under a different grant program than at issue here, finding that the plaintiffs were likely to succeed on the merits of their claim that such a cap violated the regulations. *Ass'n of Am. Univs. v. Dep't of Energy*, 789 F. Supp. 3d 118, 145 (D. Mass. 2025).

**IV. Policy Flash 2025-25**

On May 8, 2025, Defendants issued Policy Flash[1] 2025-25 titled: "Adjusting Department of Energy Financial Assistance Policy for State and Local Governments' Financial Assistance Awards." Ranucci Aff. Ex. 1 ("Policy Flash"), ECF No. 29. The Policy Flash announced Defendants' "updated policies, procedures, and general decision-making criteria for establishing standards (and limits) for payment of indirect costs related to financial assistance awarded to state and local governments." *Id.* at 3-4. As applicable to Plaintiffs, the Policy Flash explicitly "mandate[s] that the Department will limit the payment or reimbursement of all allowable, allocable, and reasonable indirect costs to a maximum of ten percent (10%) of the total project award amount." *Id.* at 5. That 10% cap (the "Cost Cap") includes both indirect costs and fringe benefit costs. *Id.* at 4. The Policy Flash also provides that the Cost Cap may be modified "[i]n circumstances where the Secretary has determined it is necessary and appropriate." *Id.* at 6. These new procedures apply to both new and conditional awards (meaning awards for which negotiations are ongoing or the award has not yet been executed). *Id.*

On June 30, 2025, Defendants disseminated a supplemental Financial Assistance Letter that provided additional information regarding the Cost Cap. Lavergne Decl. ¶ 17; Ex. B. The letter explained that the "limit applies regardless of an applicant's negotiated indirect cost rate agreement (NICRA), rate proposal, or the election of the de minimis rate," and that "[i]f an applicant's NICRA or de minimis rate yields higher indirect cost amounts than the. . . limitation allows, the limited amount must be used." *Id.* Ex. B at 6. Defendants also issued a fact sheet that clarified that the Cost Cap is distinct from a "rate cap" because it caps a total dollar amount, not

---

[1] A Policy Flash is a method of public communication used by DOE to disseminate financial information, notices of intent, guidance, and updates. Lavergne Decl. ¶ 12, ECF No. 56.

the indirect cost rate itself. Lavergne Decl. ¶ 18; Ex. C at 1. The fact sheet noted that states must "adjust their budget to ensure the cap is not exceeded." *Id*. Ex. C. at 4.

**V. Impact of Policy Flash on Plaintiffs**

As explained above, Plaintiffs receive substantial funding from DOE under grant programs subject to the Policy Flash. Those grant awards have historically included indirect and fringe costs exceeding 10%, sometimes significantly. For example, the $60,000,000 in financial assistance awards under SEP in 2024 included indirect and fringe benefit costs amounting to 25.18% of the total awards. Gerstman Decl. ¶¶ 6-7. If the Policy Flash had been in place in 2024, 47 out of 56 of SEP applications would have been rejected as out of compliance with the Cost Cap. *Id*. ¶ 8.

Since Defendants issued the Policy Flash, it has rejected many Plaintiffs' SEP budgets and applications. *See* Althoff Jr. Decl. ¶¶15-17, ECF No. 30; Benner Decl. ¶¶ 8-10; DeNicola Decl. ¶ 12, ECF No. 32; Fontaine Decl. ¶¶ 7-9, ECF No. 34; Gomez Decl. ¶¶ 14-15, ECF No 35; Goodman Decl. ¶ 9, ECF No. 36; Martin-Galardo Decl. ¶ 7, ECF No. 37; McDonald Decl. ¶ 8, ECF No. 38; Nguyen Decl. ¶ 11, ECF No. 39; Pawlisch Decl. ¶ 14, ECF No. 40; Pinsky Decl. ¶¶ 8-11, ECF No. 41; Poeschel Decl. ¶¶ 13-14, ECF No. 42; Poisson Decl. ¶ 8, ECF No. 43; Schwing Decl. ¶¶ 8-9, ECF No. 44; Swan Decl. ¶ 8, ECF No. 45; Woosley Decl. ¶¶ 10-11, ECF No. 47. Defendants' rejections were explicitly based on each state's noncompliance with the Cost Cap announced in the Policy Flash. *Id.* Some states resubmitted SEP applications that comply with the Policy Flash but included objections to the Cost Cap or otherwise reserved their rights. *See, e.g.*, Althoff Jr. Decl. ¶ 18; Benner Decl. ¶ 11; Gomez Decl. ¶ 17; Goodman Decl. ¶ 10; Martin-Galardo Decl. ¶ 10; Nguyen Decl. ¶ 13; Pawlisch Decl. ¶ 15; Pinsky Decl. ¶¶ 12-14; Poeschel Decl. ¶ 16; Poisson Decl. ¶¶ 11-12; Swan Decl. ¶ 10.

Plaintiffs' declarations provide significant detail regarding the various effects compliance with the Cost Cap has had or will have, including the inability to complete or carry out energy program projects. *See generally* Decls. in Supp. of Pls.' Mot. for Partial Summ. J. Summarizing the common impacts in general terms, the Policy Flash has or will have the effect of forcing Plaintiffs' energy agencies to reduce staff, which Plaintiffs contend hinders their ability to complete projects and further longstanding programmatic goals. *Id.* Many Plaintiffs also note that they will be required to secure additional funding sources as a result of the Policy Flash. *See*, *e.g.*, Benner Decl. ¶ 29; Martin-Gallardo Decl. ¶ 21; Pawlisch Decl. ¶ 25; Swan Decl. ¶ 17. Many Plaintiffs assert that it will not be feasible to cover the funding gap caused by the Policy Flash. *See*, *e.g.*, Althoff Jr. Decl. ¶ 38; Divan Decl. ¶ 14; Fontaine Decl. ¶ 26; Gomez Decl. ¶ 27; Goodman Decl. ¶ 26; McDonald Decl. ¶ 24; Pinsky Decl. ¶ 25; Poeschel Decl. ¶ 27; Poisson Decl. ¶ 31; Schwing Decl. ¶ 24. Plaintiff Oregon also specifically notes that the Policy Flash has the effect of "severely limiting [Oregon's] ability to protect Oregonians from radioactive and nuclear waste from the Hanford Nuclear Site." Benner Decl. ¶ 20.

## STANDARD

The Administrative Procedure Act ("APA") provides for judicial review of final agency action. 5 U.S.C. §§ 701-706. The Ninth Circuit endorses the use of Rule 56 summary judgment motions to resolve such claims. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471-72 (9th Cir. 1994). Under the APA, a court may set aside agency actions only if such actions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Court must "determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 769 (9th Cir. 1985).

## DISCUSSION

Plaintiffs move for partial summary judgment on Count I of their Complaint. Defendants responded substantively to Plaintiffs' motion and also move to dismiss for lack of subject matter jurisdiction. Because Defendants raise threshold jurisdictional questions, the Court begins by addressing Defendants' Motion to Dismiss before turning to Plaintiffs' Motion for Summary Judgment.

### I. Defendants' Motion to Dismiss

Defendants move pursuant to Federal Rule of Civil Procedure 12(b)(1) to dismiss Plaintiffs' Complaint for lack of subject matter jurisdiction. Federal courts are courts of limited jurisdiction. *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (quotation marks and citation omitted). As such, courts must presume "that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted); *see also Advanced Integrative Med. Sci. Inst., PLLC v. Garland*, 24 F.4th 1249, 1256 (2022). The Court must dismiss any case over which it lacks subject matter jurisdiction. Fed. R. Civ. P. 12(h)(3); *see also Pistor v. Garcia*, 791 F.3d 1104, 1111 (9th Cir. 2015) (noting that when a court lacks subject-matter jurisdiction, meaning it lacks the statutory or constitutional power to adjudicate a case, the court must dismiss the complaint, even *sua sponte* if necessary).

A Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction may be either "facial" or "factual." *See Edison v. U.S.*, 822 F.3d 510, 517 (9th Cir. 2016). A facial attack on subject matter jurisdiction is based on the assertion that the allegations contained in the complaint are insufficient to invoke federal jurisdiction. *Id.* "A jurisdictional challenge is factual where the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Pride v. Correa*, 719 F.3d 1130, 1133 n.6 (9th Cir. 2013). A factual

attack on the plaintiff's assertion of jurisdiction "contests the truth of the plaintiff's factual allegations, usually by introducing evidence outside the pleadings." *NewGen, LLC v. Safe Cig*, LLC, 840 F.3d 606, 614 (9th Cir. 2016). *See also Terenkian v. Republic of Iraq*, 694 F.3d 1122, 1131 (9th Cir. 2012). A factual challenge "can attack the substance of a complaint's jurisdictional allegations despite their formal sufficiency." *Dreier v. United States*, 106 F.3d 844, 847 (9th Cir. 1996) (citation and quotation marks omitted).

Here, Defendants argue that this Court lacks jurisdiction[2] because the APA does not allow review of decisions that—as they contend is the case with the Policy Flash—(A) are committed to agency discretion by law; or (B) are not final agency action.

**A. "Committed to Agency Discretion by Law"**

There is a "strong presumption" in favor of reviewability under the APA. *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018) (citation omitted). However, that presumption may be overcome "if the action is 'committed to agency discretion by law.'" *Id.* (citing 5 U.S.C. § 701(a)(2)). Courts read the "committed to agency discretion" exception "quite narrowly, restricting it to those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Id.* (internal quotations and citation omitted).

---

[2] Plaintiffs contend that Defendants' motion is improperly framed as a jurisdictional challenge, citing a recent Ninth Circuit decision which noted a "tension" between Ninth Circuit decisions that have "suggested the APA's prerequisites to judicial review are jurisdictional" and the U.S. Supreme Court's statement that '[t]he judicial review provisions of the APA are not jurisdictional.'" *Waterkeeper All. v. United States Env't Prot. Agency*, 140 F.4th 1193, 1206 n. 6 (9th Cir. 2025), (citing *Cabaccang v. U.S. Citizenship & Immigr. Servs.*, 627 F.3d 1313, 1315 (9th Cir. 2010); *Air Courier Conference v. Am. Postal Workers Union*, 498 U.S. 517, 523 n.3 (1991)). However, as in *Waterkeeper Alliance*, the Court does not address this tension because it finds that the APA's prerequisites to judicial review are met here.

Defendants contend that DOE's decisionmaking relative to financial assistance awards is committed to its discretion pursuant to the Department of Energy Organization Act, which provides in relevant part:

> The Secretary is authorized to enter into and perform such contracts, leases, cooperative agreements, or other similar transactions with public agencies and private organizations and persons, and to make such payments (in lump sum or installments, and by way of advance or reimbursement) *as he may deem to be necessary or appropriate* to carry out functions now or hereafter vested in the Secretary.

42 U.S.C. § 7256(a) (emphasis added). Defendants further cite permissive language in other statutes, including those governing SEP and WAP. *See* 42 U.S.C. § 6323(b)(1) ("The Secretary *may* grant Federal financial assistance" under SEP) (emphasis added); 42 U.S.C. § 6323(b)(3)(C) ("In determining the amount of Federal financial assistance to be provided [under SEP], the Secretary shall consider… the consistency of such plan with the purposes of this chapter, and such *other factors as the Secretary deems appropriate*") (emphasis added); 42 U.S.C. § 6864(a) (in deciding the allocation of financial assistance under WAP, DOE takes into account "[s]uch *other factors as the Secretary may determine necessary*") (emphasis added). Defendants argue that the Policy Flash only pertains to "allocation of funds," a policy decision it contends is left to its discretion and not confined by the regulations governing recovery of indirect and fringe costs.

Plaintiffs argue that this case does not fall into the narrow "committed to agency discretion" exception because the OMB Uniform Guidance in 2 C.F.R. part 200—adopted by DOE and summarized above, *see supra* p. 3—provide the necessary meaningful standard for this Court to review the Policy Flash. Plaintiffs point out that the Ninth Circuit has recently decided that those regulations do in fact provide a meaningful standard to permit review under the APA. Pls.' Reply 3-4 (citing *Thakur v. Trump*, 148 F.4th 1096 (9th Cir. 2025)). There, the Ninth Circuit held that although the defendant federal agency had general discretion to terminate

grants, the regulations governing those termination decisions provide a meaningful standard such that the action was reviewable under the APA. *Thakur*, 148 F.4th at 1105-06. Because those are the same regulations at issue here, Plaintiffs argue that the "committed to agency discretion" exception to APA review cannot apply.

The Court understands Defendants' argument slightly differently from Plaintiffs' articulation of it.[3] The crux of Defendants' argument is that the Policy Flash is *outside* of the regulations because it concerns "allocation of funds" rather than altering the mechanism by which indirect cost rates are negotiated, agreed on, and reimbursed under the regulations. Defendants contend that—unlike the recent indirect cost "*rate* cap" policies recently considered by other courts, *see supra* p. 5—the Policy Flash imposes a "*cost* cap" that "does not compel [Plaintiffs] to use an indirect cost rate different from its [NICRA]." Defs.' Opp'n 12. According to Defendants, because the Policy Flash does not affect NICRA rates but is instead a "policy to allocate more federal funding toward costs such as equipment and material and less towards costs such as labor," it is outside the purview of the regulations and instead committed to agency discretion. *Id.*

---

[3] In particular, Plaintiffs devote several paragraphs to distinguishing *Lincoln v. Vigil*, 508 U.S. 182 (1993) and *Milk Train, Inc. v. Veneman*, 310 F.3d 747 (D.C. Cir. 2002), which are cited in Defendants' brief for the proposition that "allocation of funds" is nonreviewable under the APA. However, the central question is whether the Policy Flash's use of a "cost cap" as opposed to a "rate cap" implicates the regulations, an issue on which those cases provide no helpful guidance. To the extent that Defendants' argument *is not* based on the distinction between a "rate cap" and a "cost cap," their argument fails for the same reasons articulated by the district courts that have already rejected it, finding that the regulations provide a meaningful standard of review. *See Ass'n of Am. Univs. v. Nat'l Sci. Found.*, 788 F. Supp. 3d at 126-27; *Ass'n of Am. Univs. v. Dep't of Energy*, 789 F. Supp. 3d at 139 n. 2; *Ass'n of Am. Univs. v. Dep't of Def.*, 2025 WL 2022628, at *13 (D. Mass. Jul. 18, 2025).

The Court disagrees with Defendants because the regulations are relevant to and provide a meaningful standard by which the Court may evaluate the Policy Flash under the APA. The Policy Flash does more than speak generally to the allocation of funds. Indeed, Defendants acknowledge that the Policy Flash does nothing to alter the set amount of funds allocated to each state every year. *See* Defs.' Opp'n 2 ("under some of the DOE programs, each state is allocated a set amount of federal funding each year"); *id.* at 3 n. 3 ("Formula grants are allocated to each state based on available funding each fiscal year and a set formula that divides funds among the states"); *id.* at 8 ("applicants can still receive full amounts of allocated funding by budgeting for cost elements that do not incur indirect costs"). Instead, the Policy Flash dictates the types and proportions of costs it will allow those appropriated funds to be used for. Those issues are squarely addressed by the regulations, and Defendants' characterization of the Policy Flash as imposing a "cost cap" rather than a "rate cap" does nothing to bring it outside of the regulations. As explained above, the regulations define what costs are allowable[4] and allocable and establish a procedure for determining what costs are reimbursable in what proportions, providing a meaningful standard for the Court to use in evaluating Defendants' action in issuing the Policy Flash. The matters at issue in the Policy Flash implicate the regulations and therefore do not fall in the narrow "committed to agency discretion" exception to review under the APA.

---

[4] Defendants also include a cursory argument relying on the provision in the "Factors affecting allowability of costs" section of the regulations which require that, to be allowable, costs must "[c]onform to any limitations or exclusions set forth . . . in the Federal award as to types or amount of cost items." 2 C.F.R. § 200.403(b). According to Defendants, the Policy Flash's Cost Cap is such a "limitation or exclusion" that this provision allows. But nothing in that provision indicates that it somehow relieves Defendants of their obligation to comply with the remainder of the regulations. In the absence of meaningful argument or authority supporting Defendants' position, the Court declines to read this provision so broadly as to allow Defendants to disregard applicable regulations on a whim. *See F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("An agency may not . . . simply disregard rules that are still on the books").

**B. "Final Agency Action"**

The APA limits judicial review to "final agency action." 5 U.S.C. § 704. An agency action is final when it is (1) the "consummation of the agency's decisionmaking process," not merely a "tentative or interlocutory" decision, and is (2) an action "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal citations and quotation marks omitted). In applying the *Bennett* test, the Ninth Circuit considers factors such as whether the action amounts to the agency's definitive statement of its position, whether the action had a direct and immediate effect on the subject party's daily operations, and whether the agency expects immediate compliance with the terms of the action. *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006); *Nat'l Lab. Rels. Bd. v. Siren Retail Corp.*, 99 F.4th 1118, 1123 (9th Cir. 2024). Defendants contend that this case should be dismissed because the Policy Flash does not have legal effect or consequence and is therefore not "final" and reviewable under the APA.[5]

1. Consummation of the Decisionmaking Process

To satisfy the first prong of the *Bennett* test, the agency action must "mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *Bennett*, 520 U.S. at 177-78 (internal citation and quotation marks

[5] In addition to discussing finality, Defendants briefly assert that the Policy Flash is not "agency action" within the meaning of the APA. Defs.' Opp'n 18. But beyond this conclusory statement, Defendants do not make any substantive argument on this issue, instead focusing on finality. The Court notes that the APA's definition of agency action is extraordinarily broad, encompassing "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). The definition "is meant to cover comprehensively every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 478 (2001). As the Supreme Court has made clear —and as Defendants' focus on finality implicitly acknowledges—the "bite" in "final action" is in the word "final" rather than "action." *Id.* In the absence of any specific argument that the Policy Flash is not within the APA's definition of "agency action," and considering the broad scope of that definition, the Court concludes that the Policy Flash is agency action within the meaning of the APA.

omitted). Defendants argue that the Policy Flash does not itself approve or deny grant award applications and "make[s] no decisions on any applications for federal assistance." Defs.' Opp'n 18, 20. Plaintiffs counter that the Policy Flash explicitly decides how DOE will handle grant award applications going forward.

Defendants' characterization of the Policy Flash as a mere communication of intent to engage in some future action is inconsistent with both the language of the Policy Flash and Defendants' actions following its issuance. The Policy Flash specifically provides that it "is updating its policy with respect to Department financial assistance funding awarded to state and local governments." Policy Flash 3. It contains instructions on the Cost Cap and generally mandates its application. *Id.* at 5 ("[a]ll New Awards to state and local governments will mandate that the Department will limit the payment or reimbursement of all allowable, allocable, and reasonable indirect costs to a maximum of ten percent (10%) of the total project award amount"). It provides that it is "effective immediately" as to new and conditional awards. *Id.* at 4. No language within the Policy Flash suggests that the Cost Cap is an interlocutory position. On its own terms, the Policy Flash does much more than indicate an intent to make a future decision; it *is* a decision to update Defendants' policy to include a Cost Cap for new and conditional awards.

Defendants' subsequent actions confirm that the Policy Flash marks the consummation of Defendants' decision to impose the Cost Cap. Indeed, DOE has already rejected SEP applications based expressly on those applications' failures to comply with the Cost Cap. Defendants have also confirmed that "there will be no changes to the Indirect Rate policy flashes." Poisson Decl. ¶ 10. Defendants' actions rejecting applications based on the Policy Flash and affirming that the Cost Cap will not be modified are further indications of the consummation

of their decisionmaking process. *See, e.g. San Francisco Herring Ass'n v. Dep't of the Interior*, 946 F.3d 564, 579-580 (9th Cir. 2019) (finding agency action was final when the agency had "undertaken enforcement activities confirming its decision-making process was not only consummated, but operationalized").

Defendants' arguments that the Policy Flash is not a statement of a final decision are unavailing. First, Defendants rely on their webpage where policy flashes are published, which states that "Policy Flashes transmit information and items of interest to the DOE acquisition community. A Policy Flash itself is not a statement of policy and should not be referenced as such." POLICY FLASHES, https://www.energy.gov/management/policy-flashes (last visited Oct. 22, 2025). But, as the Ninth Circuit has noted, "an agency's characterization of its action as being provisional or advisory is not necessarily dispositive." *Columbia Riverkeeper v. U.S. Coast Guard*, 761 F.3d 1084, 1094 (9th Cir. 2014). Rather, "'[i]t is the effect of the action and not its label that must be considered.'" *Oregon Nat. Desert Ass'n*, 465 F.3d at 985 (quoting *Abramowitz v. U.S. E.P.A.*, 832 F.2d 1071, 1075 (9th Cir. 1987)). Defendants' characterization of policy flashes generally does not align with the language of the Policy Flash itself or its effects as discussed above.

In arguing that the Policy Flash does not mark the consummation of its decisionmaking, Defendants also rely on the provision in the Policy Flash that the Cost Cap may be modified "in circumstances where the Secretary has determined it is necessary and appropriate." Policy Flash 5. But that provision does nothing more than make clear that the Cost Cap is Defendants' brightline, default position. "The mere possibility that an agency might reconsider . . . does not suffice to make an otherwise final agency action nonfinal." *Sackett v. E.P.A.*, 566 U.S. 120, 127 (2012); *see also See San Francisco Herring Ass'n*, 946 F.3d at 579 ("a central rationale of the

final agency action requirement is to prevent premature intrusion into the agency's deliberations; it is not to require regulated parties to keep knocking at the agency's door when the agency has already made its position clear").

The finality of the decision is particularly apparent here, where there is no procedure explained in the Policy Flash or associated guidance for grantees to request modification under this provision; where Defendants' subsequent guidance makes clear that deviations from the Cost Cap will occur only in "unusual circumstances" and require Energy Secretary Approval, Ranucci Aff. Ex. 4 at 5; and where DOE personnel have confirmed that "there will be no changes to the Indirect Rate policy flashes." Poisson Decl. ¶ 10.

In sum, the Policy Flash's affirmative imposition of the Cost Cap for all new and conditional awards marks a definitive and specific agency position that DOE has subsequently enforced. It satisfies the first prong of the *Bennett* test.

2. Legal Consequences or Obligations

To satisfy the second prong of the *Bennett* test, the action "must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett*, 520 U.S. at 177-78. The second prong provides several avenues for an agency action to meet the finality requirement, including the imposition of an obligation, denial of a right, or fixation of some legal relationship. *Oregon Nat. Desert Ass'n*, 465 F.3d at 986-87. The Ninth Circuit focuses on the "practical and legal effects" of the action and interprets finality in a "pragmatic and flexible manner." *Id.* at 982 (citation and quotation marks omitted).

Defendants argue that the Policy Flash has no legal effect or consequence because it makes no decisions on particular award applications, and that a concrete legal consequence only exists once DOE has "issued a written decision [rejecting an application] and either the time to request administrative review lapses or the administrative review is complete." Defs.' Opp'n 19

(citing 10 C.F.R. §§ 440.12, 440.30). Because Plaintiffs did not allege such a final decision here, Defendants contend there have been no legal consequences or obligations imposed.

But "[a]n agency action can be final even if its legal or practical effects are contingent on a future event." *Gill v. U.S. Dep't of Just.*, 913 F.3d 1179, 1185 (9th Cir. 2019). The Policy Flash is explicit that it is "effective immediately" and constitutes a "mandate" for "all new awards." Policy Flash 4-5. The Policy Flash is by its own terms in effect, and the legal consequences—that DOE will reject grant applications not in compliance—will flow from it. *See Ass'n of Am. Univs. v. Dep't of Energy*, 789 F, Supp. 3d at 139 (finding second *Bennett* prong satisfied because "the plain text of the Rate Cap Policy communicates that consequences are forthcoming in short order"); *Massachusetts v. Nat'l Institutes of Health*, 770 F. Supp. 3d 277, 303 (D. Mass. 2025) (finding second *Bennett* prong satisfied where it was clear from the Rate Change Notice that it would apply to all recipients and would determine the amount of indirect costs reimbursed). Those legal consequences are borne out by the record, which establishes that applications have in fact been rejected based on lack of compliance with the Policy Flash.

For the above reasons, the Court concludes that this action is reviewable under the APA because the Policy Flash is final agency action and it is not subject to the "committed to agency discretion" exception. Defendants' Motion to Dismiss is therefore denied.

## II. Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs move for partial summary judgment on Count I of their Complaint, which alleges that the Policy Flash is contrary to applicable regulations and therefore unlawful under § 706(2)(A) of the APA.[6] Plaintiffs contend that the Policy Flash violates numerous specific provisions or general principles of the regulations. The Court addresses each in turn.

---

[6] Plaintiffs did not move for summary judgment as to Count II, which alleges that Defendants violated the APA because the Policy Flash is arbitrary and capricious.

**A. Requirement to Accept NICRA Rates (2 C.F.R. § 200.414(c)(1))**

Plaintiffs first contend that the Policy Flash violates 2 C.F.R. § 200.414(c)(1), which requires all federal agencies to accept NICRA rates subject to certain exceptions, including approved "deviations." Defendants offer two arguments in opposition: (1) that the Cost Cap in the Policy Flash does not violate the provision because it does not compel Plaintiffs to accept a rate different from their NICRA rates; or alternatively, (2) that the Policy Flash is a "deviation" from NICRA rates that is permitted under the regulations.

1. <u>"Rate Cap" Versus "Cost Cap"</u>

Defendants' primary argument that the Policy Flash does not violate 2 C.F.R. § 200.414(c) ("Section (c)") is that—unlike the rate caps addressed in other recent district court cases, *see supra* p. 5—the Policy Flash does not require Plaintiffs to use indirect cost rates different from their NICRA rates because it is a "cost cap." This argument is similar to the one Defendants made in arguing that the Policy Flash is outside of the regulations and not governed by them, and the same rationale explained above applies here. Defendants' more specific argument, that the Policy Flash does not result in a violation of Section (c)(1), is likewise unavailing.

Defendants argue that "the Policy Flash does not compel any applicant to use an indirect cost rate different from its NICRA rate." Defs.' Opp'n 21. According to Defendants, Plaintiffs can simply adjust their budgets to include more cost items that do not incur as many indirect costs, thereby allowing Plaintiffs to meet the Cost Cap while still using their NICRA rates. That argument attempts to evade Section (c)(1)'s requirement that federal agencies "must . . . accept" NICRA rates by dictating what kinds of costs will be allowable and allocable, which contravenes the regulatory scheme that governs those costs. In other words, the Policy Flash functionally forces Plaintiffs not to apply at their NICRA rates in the first place.

Defendants' attempts to evade running afoul of Section (c)(1) by framing the policy as a cost cap rather than a rate cap fail because the Cost Cap still results in Defendants rejecting NICRA rates within the framework of the applicable regulations. The Policy Flash is clear: Defendants will not reimburse indirect costs in excess of the Cost Cap. Plaintiffs seeking reimbursement for allowable and allocable indirect costs will have their applications rejected if they exceed the Cost Cap, regardless of their NICRA rates. *See* Lavergne Decl. Ex. B at 6 ("If an applicant's NICRA or de minimis rate yields higher indirect cost amounts than the 15% limitation allows, the limited amount must be used"); Ranucci Aff. Ex. 4 at 3 ("if the dollar amount of indirect costs under the [NICRA] rates exceeds the cap amount, the amount more than the cap is not allowed, and rates may need to be adjusted downward"). Indeed, Plaintiffs' applications seeking their NICRA rates have already been rejected due to lack of compliance with the Policy Flash's Cost Cap. Thus, the Cost Cap in the Policy Flash violates Section (c)(1)'s requirement that federal agencies "must . . . accept" NICRA rates.

2. <u>"Deviation"</u>

Defendants alternatively argue that "deviation" from NICRA rates is permitted here because: "[a] Federal agency may use a rate different from the negotiated rate for either a class of Federal awards or a single Federal award . . . when approved by the awarding Federal agency in accordance with paragraph (c)(3) of this section." 2 C.F.R. § 200.414(c)(1). Section (c)(3) in turn provides that, in order to deviate from NICRA rates, "[t]he Federal agency must implement, and make publicly available, the policies, procedures and general decision-making criteria that their programs will follow to seek and justify deviations from negotiated rates."

Defendants contend that the Policy Flash satisfies the procedural requirements to allow deviation from NICRA rates. Plaintiffs contend that Defendants' reliance on Section (c)(3) is an impermissible post-hoc rationalization, and in any event does not comply with the requirements

for a permissible deviation from NICRA rates. Regardless of the propriety of a post-hoc rationalization, the Court agrees that the Policy Flash is not a permissible deviation under the regulations for two reasons.

First, deviations are only permissible for "a class of Federal awards or a single Federal award." 2 C.F.R. § 200.414(c)(1). A "class of Federal awards" is defined to mean "a group of Federal awards either awarded under a specific program or group of programs or to a specific type of recipient or group of recipients to which specific provisions or exceptions may apply." 2 C.F.R. § 200.1. According to Defendants, because the regulations do not limit the size of the class, a deviation may be appropriately applied to all "DOE-administered awards to state and local governments." Defs.' Opp'n 22. A similar argument has already been rejected by another district court, which explained:

> If a "class of Federal awards" actually means *all* Federal awards, the definition . . . would be rendered entirely superfluous and meaningless. *Pulsifer v. United States*, 601 U.S. 124, 125, 144 S.Ct. 718, 218 L.Ed.2d 77 (2024) ("When a statutory construction 'render[s] an entire subparagraph meaningless,' this Court has noted, the canon against surplusage applies with special force.") (quoting *National Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 128, 138 S.Ct. 617, 199 L.Ed.2d 501 (2018)).
>
> Even the dictionary definition of class—a "group, set, or kind sharing common attributes"—underscores that the plain meaning of the text refers to a subset, as opposed to all, federal awards. *Class*, The Merriam-Webster Dictionary (2025). In ignoring the plain meaning, Defendants are asking the Court to re-mold the text to meet the Administration's policy goals. *See Fourstar v. Garden City Grp., Inc.*, 875 F.3d 1147, 1152 (D.C. Cir. 2017) (Kavanaugh, J.) ("It is not a judge's job to add to or otherwise re-mold statutory text to try to meet a statute's perceived policy objectives. Instead, we must apply the statute as written.").

*Massachusetts v. Nat'l Institutes of Health*, 770 F. Supp. 3d at 298. The Court finds no reason to depart from this well-reasoned explanation. *See also Ass'n of Am. Univs. v. Nat'l Sci. Found.*, 788 F. Supp. 3d at 132 (construing a "class of federal awards" as encompassing *all* awards to the plaintiffs "would allow the exception to swallow the rule"); *Ass'n of Am. Univs. v. Dep't of*

*Energy*, 789 F. Supp. 3d at 144 n. 4 (expressing skepticism that "a broad-based classification is what the regulations intended," and that "[t]o permit an exception to the negotiated indirect cost rates for [such a broad-based class] in the same missive strikes this Court as lacking the specificity that the definition contemplates").

Second, the Policy Flash does not comply with the procedural requirements of Section (c)(3), under which "[t]he Federal agency must implement, and make publicly available, the policies, procedures and general decision-making criteria that their programs will follow to seek and justify deviations from negotiated rates." Here, Defendants have done no such thing. The Policy Flash does not identify or set forth a scheme to implement a procedure or identify criteria to "seek and justify" deviations, but instead simply announces a categorical rule. Again, one of the other district courts addressing this same argument provides a well-reasoned explanation of the deficiencies in Defendants' argument:

> [Section (c)(3)] contemplates a step-by-step process for a change to a negotiated indirect cost rate, rather than a one fell swoop approach invalidating all pre-existing NICRAs and changing the well-established procedure for all future grants. The plain terms of Section (c)(3), which outline the requirements for deviating from the negotiated indirect cost rate pursuant to Section (c)(1), appear to require sequencing. The provision states that the awarding agency seeking a deviation " 'must'—present tense—make available the policies, procedures, and decision-making criteria that [it] 'will follow'—future tense—to seek and justify the deviation." *NIH*, 770 F.Supp.3d at 298. To read the provision to permit the DOE to make the 15 percent rate cap policy public at the same time as it seeks to enforce it would read these verb tenses, as well as the requirement that the DOE "justify" the deviation, out of the provision.

*Ass'n of Am. Univs. v. Dep't of Energy*, 789 F. Supp. 3d at 145. Announcing an across-the-board deviation from NICRA rates that will apply to all future awards does not comply with the procedural requirements of Section (c)(3). That provision does not provide an exception that would bring the Policy Flash in compliance with the regulatory mandate to accept NICRA rates.

Accordingly, the Policy Flash is contrary to law because it violates 2 C.F.R. § 200.414(c)(1).

**B. Notice Requirement - 2 C.F.R. § 200.414(c)(4)**

Second, Plaintiffs contend that—with respect to awards for which negotiations were ongoing or the award not yet executed at the time of the Policy Flash ("conditional awards")—the Policy Flash violates Section (c)(4), which requires that "[t]he Federal agency must include, in the notice of funding opportunity, the policies relating to indirect cost rate reimbursement." Because the Cost Cap announced in the Policy Flash was not included in any notices of funding opportunities for conditional awards (because it had not yet been issued), Plaintiffs contend that Defendants have violated this provision. Defendants' sole response to this argument is that they will include the Policy Flash in notices of funding opportunities "moving forward." Defs.' Opp'n. 24.

Defendants' argument does not address the substance of Plaintiffs' argument, which specifically pertains to awards for which the notices of funding opportunities had already been issued. Defendants do not apparently dispute that the Policy Flash was not announced in already-existing notices of funding opportunities. Thus, because the Cost Cap was not included in the notices of funding opportunities that already existed at the time of the Policy Flash, it violates Section (c)(4) with respect to conditional awards for which the notice of funding opportunity preceded the Policy Flash.

**C. Pass-through NICRA Rates - 2 C.F.R. § 200.414(d)**

Third, Plaintiffs argue that the Policy Flash violates 2 C.F.R. § 200.414(d), which requires that "pass-through entities . . . must accept all federally negotiated indirect costs rates for subrecipients." As explained above, this means that when Plaintiffs provide subawards to other recipients (i.e. act as pass-through entities), the NICRA rates apply to those subrecipients

as well. Here, DOE guidance documents related to the Policy Flash make clear that the Cost Cap "applies to the prime recipient and subrecipients." Ranucci Aff. Ex. 2 at 6; *see also id.* Ex. 3 at 4 ("All . . . Subrecipients are to follow the applicable percentage caps"). Plaintiffs argue that the application of the Policy Flash's Cost Cap to subrecipients violates 2 C.F.R. § 200.414(d)'s requirement that pass-through entities must accept NICRA rates. Defendants' argument in opposition to this alleged violation of the statute relies on the same rationale as its arguments under Section (c)(1) and therefore fails for the same reason discussed above. The Policy Flash is contrary to law because it violates 2 C.F.R. § 200.414(d).

**D. De Minimis Rates - 2 C.F.R. § 200.414(f)**

Fourth, Plaintiffs argue that the Policy Flash is contrary to 2 C.F.R. § 200.414(f), which allows grant recipients to opt for a de minimis 15% indirect cost rate in lieu of negotiating a NICRA rate. That provision also prohibits federal agencies from "requir[ing] recipients and subrecipients to use a de minimis rate lower than the negotiated indirect cost rate or the rate elected pursuant to this subsection unless required by Federal statute or regulation." 2 C.F.R. § 200.414(f). Plaintiffs argue that the Policy Flash—which imposes a cost cap that results in an indirect cost rate below the de minimis rate—violates this provision. Defendants argue that this provision simply speaks to the alternative process by which a grantee can opt out of negotiating for a NICRA rate, and that it does not alter the Policy Flash's compliance with Sections (c)(1) and (c)(3).

Defendants' argument misses the mark. Plaintiffs do not invoke 2 C.F.R. § 200.414(f) in order to argue that it "displaces" Sections (c)(1) and (c)(3), as Defendants contend. Defs.' Opp'n 25. Rather, the issue is that the Policy Flash does violate Section (c)(1) by unlawfully deviating from NICRA rates (for the reasons discussed above) *and* requires Plaintiffs to accept a rate below the alternative de minimis rate required when there is no NICRA rate. The recent decision

in *Ass'n of Am. Univs. v. Nat'l Sci. Found.*, is instructive. The court there addressed a similar issue with respect to a 15% indirect rate cap imposed by the National Science Foundation ("NSF") on its grantees. Although the grantees had NICRA rates, the court held that the rate cap unlawfully imposed a de minimis rate outside of the opt-in procedure contemplated by Section (f):

> With the 15% Indirect Cost Rate, NSF has rejected the regulatory framework for funding indirect research costs and has limited the recovery of actual costs by imposing a de minimis rate on [grantees] with negotiated indirect cost rates . . . in violation of Section 200.414(f). Contrary to subsection 200.414(f), which allows for this rate only on the [grantee's] election where there is no negotiated rate, the 15% Indirect Cost Rate "app[lies] a standard indirect cost rate not to exceed 15%"—i.e. a de minimis rate—"to all grants and cooperative agreements awarded to IHEs for which indirect costs are allowable." NSF *Policy Notice: Implementation of Standard 15% Indirect Cost Rate*, NSF 25-034.

*Ass'n of Am. Univs. v. Nat'l Sci. Found.*, 788 F. Supp. 3d at 131-32.

The Policy Flash here poses even more problems because it not only effectively imposes a de minimis rate in lieu of Plaintiffs' NICRA rates outside of the regulatory scheme—as was the case in *Ass'n of Am. Univs. v. NSF*—but also effectively sets that rate that *below* the de minimis 15% rate contemplated by the regulations. *See also Ass'n of Am. Univs. v. Dep't of Def.*, 2025 WL 2022628, at *17 (D. Mass. Jul. 18, 2025) ("For recipients that *do* have a NICRA, subsection (f) . . . clearly establishes that grant recipients 'are not required to use the de minimis rate.' That text would mean nothing if agencies were technically disallowed from imposing a de minimis rate but nevertheless free to unilaterally impose an indirect cost rate that is its literal equivalent") (citing 2 C.F.R. § 200.414(f)). The Policy Flash violates 2 C.F.R. § 200.414(f) by effectively imposing an indirect cost rate that is below the de minimis rate contemplated by that section.

**E. Fringe Benefits**

Plaintiffs argue that the Policy Flash generally violates the regulatory scheme governing reimbursement of fringe benefits. Unlike the rate caps addressed in the other cases pertaining to

federal grants, the Cost Cap imposed in the Policy Flash sweeps in fringe benefits with indirect costs. Plaintiffs argue that the Cost Cap violates 2 C.F.R. § 200.431(c)'s directive as to how fringe costs are classified as well as the general scheme for reimbursement of fringe benefits.

Plaintiffs first argue that the Policy Flash is contrary to the regulations' classification of fringe costs. The regulations provide that fringe benefits may be classified as either direct or indirect costs. 2 C.F.R. § 200.431(c). There are specific regulations defining what is a direct or indirect cost, depending on how the costs are associated with a particular project. *See* 2 C.F.R. §§ 200.412-414. The regulations explicitly acknowledge that fringe benefits may be included as direct costs when they are incurred for a particular project, *see* 2 C.F.R. § 200.413(b), and that such benefits may be "charged as direct or indirect costs following the recipient's or subrecipient's accounting practices." 2 C.F.R. § 200.431(c).

Plaintiffs argue that by including fringe benefits in the Cost Cap on indirect costs, the Policy Flash essentially forces reclassification of direct fringe costs as indirect costs in contravention of the regulatory framework for such classifications. The Court agrees. As explained above, the regulations allow grantees to charge fringe benefits as direct or indirect costs according to their accounting practices and the guidelines for classifying costs as direct or indirect. The Policy Flash's categorical inclusion of all fringe benefits as encompassed by the Cost Cap functionally recategorizes all fringe benefits as indirect costs, despite the regulations' provisions governing how fringe benefits may be charged. Defendants attempt to write off the relevant regulations as pertaining only to "accounting treatment" that is "irrelevant to the question of whether DOE complied with controlling law." Defs.' Opp'n 26. But as Defendants appear to acknowledge, those regulations "provide[] criteria for identifying and categorizing certain types of fringe benefit costs." *Id.* Those criteria are precisely the issue: when the

regulations define how fringe benefits may be categorized and charged, Defendants' policy effectively forcing a conflicting categorization violates those regulations.

Second, Plaintiffs contend that the Policy Flash violates the regulations requiring Defendants to reimburse costs, including fringe benefits, so long as such costs are chargeable under the regulatory scheme. Specifically, the regulations provide that "[t]he total cost of a Federal award is the sum of the allowable direct and allocable indirect costs minus any applicable credits." 2 C.F.R. § 200.402. The regulations provide specific criteria for the allowability of costs, 2 C.F.R. § 200.403, and additional requirements for reimbursement of fringe benefits, 2 C.F.R. § 200.431 (a), (c). The Court agrees that the Policy Flash is contrary to these regulations. The Policy Flash is wholly divorced from that regulatory scheme, applying a categorical cap regardless of whether fringe benefits are reimbursable under the regulations. In opposition to Plaintiffs' motion, Defendants rely on several of the same arguments about the scope of its discretion and the application of 2 C.F.R. § 200.403(b) that the Court has already considered and rejected. *See supra* p. 10.

Accordingly, the Policy Flash violates the regulatory framework governing classification and recovery of fringe benefits.

**F. Cost Sharing**

Finally, Plaintiffs contend that the Policy Flash unlawfully requires "cost sharing." The regulations place restrictions on "cost sharing," which is "the portion of project costs not paid by Federal funds or contributions." 2 C.F.R. § 200.1. The various rules applicable to cost sharing provide a "clear presumption against (and specific procedures in the case of) mandatory cost sharing." *Ass'n of Am. Univs. v. Dep't of Def.*, 2025 WL 2022628, at *6 (citing 2 C.F.R. § 200.414(c)(4), (f); § 200.211(b)(9); § 200.306(a)-(k); part 200 app. I(b)(2)(ii)). For DOE to require cost sharing, it must "include, in the notice of funding opportunity, the policies relating to

indirect cost rate reimbursement or cost share." 2 C.F.R. § 200.414(c)(4); *see also* § 200.211(b)(9). Plaintiffs argue that the Policy Flash is contrary to law because it functionally mandates cost sharing and DOE has not complied with the regulations for such cost sharing.

In arguing that the Policy Flash does not violate cost sharing regulations, Defendants first contend that because the Policy Flash is only forward-looking, it cannot have violated the regulations because DOE can include the terms in its notices of funding opportunities moving forward. This argument is flawed for the same reason addressed above with respect to the notice requirement in 2 C.F.R. § 200.414(c)(4): the Policy Flash does not only apply to new awards, but also to conditional awards for which notices of funding opportunities were already issued when the Policy Flash was published.

Defendants also continue to rely on their dubious distinction of the Cost Cap from previously rejected rate caps. Defendants contend that the Policy Flash does not mandate cost sharing (or invoke the regulations applicable to mandatory cost sharing) because Plaintiffs may adjust their budgets to reduce labor costs and thereby receive the full federal award available and avoid incurring their own costs. In other words, they contend that the Policy Flash cannot possibly "mandate" cost sharing if Plaintiffs can budget their way out of it. This argument flies in the face of reality as reflected by the record. Plaintiffs cannot shift their budgets to incur a greater proportion of direct costs without associated labor unless they are "legitimate direct costs required to meet the project objectives of the DOE award." Ranucci Aff. Ex. 4 at 4. Plaintiffs' declarations provide ample support as to why they cannot fulfill project and program goals without the staff necessary to do so. *See supra* p. 8. Plaintiffs further provide evidence that they will in fact need to obtain additional funding or that they are simply unable to cover the funding gap created by the Policy Flash. *Id.* A policy that forces grantees to partially fund project costs is

merely "cost sharing by another name." *Ass'n of Am. Univs. v. Dep't of Def.*, 2025 WL 2022628, at *6.

Thus, the record supports Plaintiffs' contention that the Policy Flash has the functional effect of mandating cost sharing by making it infeasible for Plaintiffs to implement funded projects without partially covering project costs themselves. Because mandatory cost-sharing is only permissible when it complies with the regulations, and because Defendants cannot have complied with the applicable notice requirements with respect to conditional awards for which notices of funding opportunities had already been issued, the Policy Flash violates the cost sharing regulations.

For the above reasons, the Court concludes that the Policy Flash is contrary to numerous applicable regulations and the regulatory scheme as a whole. It therefore violates the APA and Plaintiffs are entitled to summary judgment on Count I of their Complaint. Because that claim is dispositive of this matter, the Court will address remedy.

## III. Remedy

Plaintiffs request several forms of relief, including vacatur of the Policy Flash, injunctive relief, and a declaratory judgment finding that the Policy Flash is contrary to law.

As to declaratory relief, Defendants' briefing does not indicate any opposition to that remedy (other than objecting on the merits). The Court finds that a declaratory judgment is appropriate here because such relief will "serve a useful purpose in clarifying and settling" the legality of the Policy Flash and "will terminate and afford relief from the uncertainty, insecurity, and controversy" caused by it. *See Bilbrey by Bilbrey v. Brown*, 738 F.2d 1462, 1470 (9th Cir. 1984) (internal citation and quotation marks omitted). Accordingly, the Court's judgment will declare that the Policy Flash is contrary to law.

Defendants do object to (A) vacatur and (B) injunctive relief.

**A. Vacatur**

Plaintiffs ask the Court to vacate and set aside the Policy Flash. Defendants argue (1) that remand (not vacatur) is the appropriate remedy, and (2) that even if vacatur were appropriate, the APA does not authorize the Court to universally vacate the Policy Flash.

First, with respect to remand without vacatur, Defendants rely on *Trump v. CASA, Inc.*, 606 U.S. 831 (2025) for the proposition that universal vacatur is inappropriate. But that case is inapposite because it concerns injunctive relief and is not in the context of an APA claim. Indeed, the Supreme Court there specifically explained that "[n]othing we say today resolves the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action." *Id*. at 847 n. 10.

This distinction for agency action that is contrary to law[7] under the APA makes sense and is grounded in the text of the APA. As aptly summarized by another district court presented with the same argument, "[p]ut simply, the APA requires this Court to 'set aside' unlawful or inadequately reasoned agency action. 5 U.S.C. § 706(2). To 'set aside' agency action is 'to annul or vacate' it. *Set Aside*, BLACK'S LAW DICTIONARY (12th ed. 2024)." *Ass'n of Am. Univs. v. Dep't of Def.*, 2025 WL 2899765, at *27. Thus, vacatur is the presumptive remedy for unlawful agency action. *All. for the Wild Rockies v. U. S. Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018).

[7] Defendants rely on *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729 (1985), arguing "[u]pon determination that an agency has violated the APA, 'the proper course, except in rare circumstances, is to remand to the agency.'" Defs.' Opp'n 28 (citing *Fla. Power & Light*, 470 U.S. at 744). Defendants' quotation is incomplete. The Supreme Court actually said, "[i]f the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation" *Fla. Power & Light*, 470 U.S. at 744. As the complete quote makes clear, it has no bearing on this case, which pertains to agency action contrary to law.

Second, Defendants argue that the vacatur should be party-specific, and that a universal vacatur of the Policy Flash would be inappropriate under "traditional equitable principles." Defs.' Opp'n 28. This argument was likewise recently rejected by another district court presented with it in one of the similar "rate cap" cases:

> Defendants' second argument fundamentally misunderstands vacatur as a remedy. Vacatur acts directly on the "agency action." *Corner Post*, 603 U.S. at 838, 144 S.Ct. 2440 (Kavanaugh, J., concurring) ("[T]he APA ... empower[s] the judiciary to act directly against the challenged agency action." (quoting Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 VA. L. REV. 933, 1012 (2018))). . . . [T]here are circumstances where only "part of an agency rule [or] order" constitutes the relevant discrete "agency action," making vacatur of which severable from its remainder. *See* 5 U.S.C. § 551(13). In this case, however, there is no obvious way to divvy up the Rate Cap Policy to vacate only that "part" that is applicable to Plaintiffs. The scope of vacatur here is therefore not truly a product of the remedy, nor of the Court's prerogative, but of Defendants' own capacious undertaking. The bottom line is that the "agency action" is the irreducible *thing* over which this Court has authority under section 706 of the APA, and that *thing* here is undisputedly the Rate Cap Policy.

*Ass'n of Am. Univs. v. Dep't of Def.*, 2025 WL 2899765, at *28. That same logic applies here. The Policy Flash is—like the Rate Cap Policy in *Ass'n of Am. Univs.*—the "agency action" Plaintiffs challenged. In granting Plaintiffs' Motion for Partial Summary Judgment, the Court has found that particular agency action is contrary to law. The Court therefore vacates the Policy Flash in full pursuant to the APA.

**B. Injunctive Relief**

Plaintiffs also seek injunctive relief. A plaintiff seeking permanent injunctive relief must demonstrate "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). An injunction is a "drastic and extraordinary

remedy" that Courts should not issue "as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010).

Plaintiffs ask the Court to "set aside any rejections to Plaintiffs' award applications, whether formal or informal, issued pursuant to or in reliance on the Policy Flash;" and to enjoin "Defendants and their officers and agents from implementing the Policy Flash or a substantially similar policy that caps states and local government reimbursement of indirect and/or fringe costs in Plaintiff States." Pls.' Proposed Order ¶¶ 3-4. In opposition, Defendants argue that (1) injunctive relief is unnecessary and inappropriate in light of the other relief requested; (2) the injunctive relief sought is unclear and impracticable; and (3) that Plaintiffs have not shown irreparable harm to each Plaintiff.

1. <u>Necessity of Injunctive Relief</u>

Defendants first argue that an injunction is inappropriate because vacatur and a declaratory judgment are sufficient to afford Plaintiffs complete relief. The Supreme Court has explained that courts should not issue injunctive relief if it "does not have any meaningful practical effect independent of . . . vacatur." *Monsanto*, 561 U.S. at 165. Indeed, several other district courts in the similar rate cap cases have declined to issue injunctive relief for that reason. *See, e.g., Ass'n of Am. Univs. v. Dep't of Def.*, 2025 WL 2899765, at *30 ("an order declaring unlawful and vacating the Policy would fully resolve the parties' dispute and prevent injury to Plaintiffs"); *Ass'n of Am. Univs. v. Nat'l Sci. Found.*, 788 F. Supp. 3d at 143 ("Enjoining Defendants from implementing or enforcing a policy that has been vacated would be duplicative").

Here, however, the injunctive relief Plaintiffs seek is not coextensive with the other relief the Court has ordered. Separately from vacating the Policy Flash, Plaintiffs also ask the Court to set aside Defendants' rejections of award applications that were based on the Cost Cap

announced in the Policy Flash, noting that vacating the Policy Flash leaves the door open for Defendants to argue that those rejections need not necessarily be set aside. Pls.' Supp. Mem. 4 (citing *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2661 (2025) (Barrett, J., concurring) ("vacating the guidance does not necessarily void decisions made under it")). The concern that Defendants will continue to implement the Cost Cap even if the Policy Flash is vacated is underscored by evidence in the record that Defendants have implemented the Cost Cap without reference to the Policy Flash. *See* Dello Decl. Ex. B, ECF No. 65 (DOE terms and conditions for a North Carolina financial assistance award that include a requirement that "the recipient is limited to a maximum percentage of 10% of the Total Award Amount for reimbursement of indirect costs and fringe benefits costs" without specific reference to the Policy Flash). Considering these facts, the Court finds that an injunction prohibiting implementation of the Cost Cap in any form is warranted to ensure there is certainty for Plaintiffs and clarity for DOE grant officers about what prior award applications are affected by the Court's conclusions on the merits of this case.

There is also a related prospective aspect of the injunctive relief Plaintiffs seek that is not encompassed by vacatur. Plaintiffs request that the Court enjoin Defendants from implementing "a substantially similar policy" that caps indirect or fringe costs. Pls.' Proposed Order ¶ 4. The Court finds that this relief is not encompassed by the other relief ordered and is warranted under the facts of this case. As of the date Defendants issued the Policy Flash, at least one court had found a similar[8] cap unlawful, permanently enjoining its implementation. *See Massachusetts v. Nat'l Insts. of Health*, 2025 WL 1063760. Moreover, Defendants themselves had been subject to

---

[8] While Defendant argues that those cases are not similar because they involve "rate caps" rather than "cost caps," that is a distinction without a functional difference for the reasons already addressed in the merits portion of this opinion.

a temporary restraining order preventing them from implementing a rate cap in the context of grants for institutions of higher education. *See Ass'n of Am. Univs. v. Dep't of Energy*, 2025 WL 1119791 (D. Mass. Apr. 16, 2025). And, as summarized above, *see supra* p. 5, there have been numerous other instances of government agencies imposing limits on indirect cost reimbursement contrary to the regulations. Several of these policies also post-dated the April 4, 2025 ruling finding that a rate cap is contrary to the regulations. *Ass'n of Am. Universities v. Nat'l Sci. Found.*, 788 F. Supp. 3d at 120 (addressing indirect rate cap issued on May 2, 2025); *Ass'n of Am. Univs. v. Dep't of Def.*, 2025 WL 2899765, at *2 (addressing rate cap policies issued on May 14, 2025, and June 12, 2025). In other words, government agencies—including Defendant DOE—have repeatedly attempted to impose caps on indirect costs (whether via a "rate cap" or "cost cap") despite a court ruling that such caps violate the regulations. In light of government agencies' repeated attempts to issue and implement these policies despite knowledge of their illegality, the Court finds that the prospective relief Plaintiffs request is appropriate to prevent continued attempts to implement unlawful caps on indirect costs.

2. Practicability of Injunctive Relief

Defendants also contend that an order setting aside any rejections of award applications based on the Policy Flash is not practicable. In particular, Defendants argue that it will be "difficult to discern" which rejections must be set aside. Defs.' Mem. Opp'n to Proposed Order at 4, ECF No. 78. The Court is not persuaded. The declarations submitted in support of Plaintiffs' motion show that Defendants often explicitly stated in such rejections that they were based on failure to comply with the Cost Cap. Defendants have not articulated a reason why, despite their own stated reasons for award rejections, they are unable to discern why Plaintiffs' applications were rejected. Setting aside rejections based on the Cost Cap is not unworkable for this reason.

Defendants note that some Plaintiffs whose applications were rejected have already submitted amended award applications in compliance with the Policy Flash and obtained final awards. For those awards, Defendants explain that the relief Plaintiffs seek is unclear as to its effect on these accepted applications. During a status conference on the issue of remedy, the parties appeared to agree that those Plaintiffs would be able to seek modification of their awards based on the vacatur of the Policy Flash. Thus, those awards remain in place, and Plaintiffs may seek their modification. Consistent with the rest of this order, Defendants may not deny any modification based on any cap on indirect or fringe costs.

3. Irreparable Harm

Defendants also present several arguments that Plaintiffs have failed to show irreparable harm. Defendants first argue that the economic injuries Plaintiffs allege are insufficient to demonstrate irreparable harm. But the very case Defendants cite undermines that proposition with respect to this case because it acknowledges that the rule is premised on the availability of a damage award. *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) ("It is true that economic injury alone does not support a finding of irreparable harm, *because such injury can be remedied by a damage award*") (emphasis added). Indeed, the Ninth Circuit has recognized that "where parties cannot typically recover monetary damages flowing from their injury—as is often the case in APA cases—economic harm can be considered irreparable." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021). Thus, Defendants' economic harm argument fails because there is no monetary award available in this case.

Defendants also argue that Plaintiffs have failed to show irreparable harm with respect to each individual Plaintiff because there are no declarations in the record as to Plaintiffs Maine, Nevada, New Mexico, and District of Columbia. The government has made this argument

before, and it was rejected. In *Ass'n of Am. Univs. v. Dep't of Def.*, the court found that declarations from some organizational plaintiffs and their members were sufficient to demonstrate irreparable harm as to all organizational plaintiffs. 2025 WL 2022628, at *23 n. 74. As the court explained:

> All IHEs, for decades, have had to follow the Uniform Guidance, its cost principles, and its accounting requirements. It follows that all Organizational Plaintiffs' member institutions with DOD funding would experience the same kind of upheaval and disruption as a result of that system's being suddenly and drastically replaced by one that explicitly seeks to shift the cost of DOD research to those institutions. . . . Accordingly, the Court finds that there is more than "an adequate foundation from which one could draw [the] inference[ ]," that all Organizational Plaintiffs' member institutions subject to the Rate Cap Policy are likely to suffer the irreparable harm detailed by those that have testified.

*Id.* (internal citation omitted). This Court applies the same reasoning here. As discussed above, there is ample evidence of the harm caused by the Policy Flash to most Plaintiffs, including a diminished ability to complete projects and further longstanding and important programmatic goals related to energy efficiency, security, reliability, and resilience. Considering the nature of the Policy Flash (which applies equally to all Plaintiffs), the vast departure from the long-standing regulatory structure Plaintiffs have long relied on, and the similarity of those harms between the majority of Plaintiffs who did submit declarations, the Court finds the record sufficient to establish irreparable harm to all Plaintiffs.

\\

\\

\\

\\

\\

\\

\\

## CONCLUSION

For the reasons above, Defendants' Motion to Dismiss (ECF No. 59) is DENIED and Plaintiffs' Motion for Partial Summary Judgment (ECF No. 28) is GRANTED. Because Plaintiffs' motion is dispositive of this matter, the Court will enter Judgment.

DATED this 10th day of November 2025.

s/ Mustafa T. Kasubhai
MUSTAFA T. KASUBHAI (He / Him)
United States District Judge